**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

DANIELLE C. SMITH,            )
                             )
            Plaintiff,        )
                             )
      v.                     )            1:09CV951
                             )
BANK OF STANLY,               )
                             )
            Defendant.        )

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the undersigned United States Magistrate Judge for a recommended ruling on Defendant's Motion for Judgment on the Pleadings (Docket Entry 12) and Defendant's Motion for Summary Judgment (Docket Entry 22). (See Docket Entries dated June 16 and Dec. 20, 2010; Fed. R. Civ. P. 72(b)(1).) For reasons that follow, the Court should grant Defendant's summary judgment motion and deny its motion for judgment on the pleadings as moot.

<u>PROCEDURAL BACKGROUND</u>

Plaintiff's Complaint alleges that she was "punished and terminated . . . as a result of Defendant's unlawful discrimination and retaliation . . . in violation of Federal Law . . . ." (Docket Entry 2 at 10.)[1] More specifically, it declares:

1) "Defendant has treated female employees, including Plaintiff, unequally to male employees" (id.);[2]

---

[1] Plaintiff initially filed the Complaint in state court and Defendant removed the case to this Court. (See Docket Entry 1.)

[2] The Complaint appears to charge Defendant with subjecting Plaintiff to two general forms of sex-based disparate treatment: 1) treating her more "harshly and derogatorily" (for which it gives one example from December 2006) (continued...)

2) "Defendant's adverse actions against Plaintiff in and related to her employment were substantially related to her sex and the conduct of her husband, rather than her own conduct, and Defendant's adverse actions against Plaintiff related to her sex and the conduct of her husband were not proper and amount to discrimination against Plaintiff in employment related to her sex. (Violations of Title VII of Civil Rights Act of 1964.)" (id. (parentheses in original));[3]

3) "Defendant has also retaliated against Plaintiff related to her expressions of concern about Defendant's unequal treatment of Plaintiff and other female employees related to employment in violation of Federal Law prohibiting such retaliation" (id.); and

4) "Defendant has also discriminated against Plaintiff in her employment related to her association with someone with disability, her husband, in violation of federal law. [Violations of Americans with Disabilities Act (ADA).]" (id. (brackets in original)).

In addition, although Plaintiff's Complaint does not expressly assert a claim for sex discrimination in the form of a hostile work environment, it does allege that:

_____

[2](...continued)
(Docket Entry 2 at 2); and 2) imposing greater "expectations and demands" (as to which it offers no specifics) (id. at 3).

[3] Although the Complaint generally references "adverse actions" taken by Defendant against Plaintiff, it does not identify such matters with specificity; however, at various places, the Complaint appears to condemn Defendant's decisions: 1) to move Plaintiff to Defendant's main office in January 2008 (Docket Entry 2 at 5); 2) to place Plaintiff on "probation" on March 26, 2008 (id. at 6); and 3) to force Plaintiff to resign in meetings on March 26, 2008, March 27, 2008, and April 1, 2008 (id. at 7-8).

1) "[i]n December 2006, Defendant's President <u>verbally assaulted</u> Plaintiff, using profanity, at work in response to a scheduling inquiry" (<u>id.</u> at 2 (emphasis added));

2) "[m]ales in similar roles with Defendant were not treated as harshly and derogatorily as Plaintiff was treated by Defendant's President" (<u>id.</u>);

3) "[i]n December 2006, Plaintiff reported the <u>harassment</u> to Defendant's Vice President of Human Resources, as Plaintiff understood was the appropriate action in the case of such harassment" (<u>id.</u> (emphasis added)); and

4) "[i]n [a] December 10, 2007 meeting, Defendant's male officials discussed Plaintiff's medical situation and a sexual relationship Plaintiff's husband had with his therapist and also made several <u>inappropriate and wrongful comments</u> to Plaintiff related to other personal matters" (<u>id.</u> at 3 (emphasis added)).

During the discovery period, Defendant filed a Motion for Judgment on the Pleadings seeking dismissal of Plaintiff's ADA claim. (Docket Entry 12.) Plaintiff responded in opposition and Defendant replied. (Docket Entries 14 and 15.) After discovery ended, Defendant moved for summary judgment on all of Plaintiff's claims. (Docket Entry 22.) In support of that motion, Defendant filed a brief (Docket Entry 23), to which it attached:

1) an affidavit from Tammie Aldridge, an employee of Defendant, who worked with Plaintiff (Docket Entry 23-2);

2) an affidavit from Susan Gibson, Vice President of Human Resources for the holding company to which Defendant belongs, with

memoranda from Plaintiff's personnel file and excerpts from Defendant's employee conduct code (Docket Entry 23-3);

3) an affidavit from Sandy Hinson, the manager of Harmanco's Restaurant in Albemarle, North Carolina, the site of an altercation involving Plaintiff, her husband, and a friend on March 15, 2008 (Docket Entry 23-4);

4) an affidavit from Willie D. Lawhon, Defendant's President (Docket Entry 23-5);

5) an affidavit from John McIntyre, a Senior Vice President for Defendant (Docket Entry 23-6);

6) excerpts from the transcript of Plaintiff's deposition from October 19 and November 9, 2010 (Docket Entry 23-7);

7) excerpts from the transcript of the deposition of Plaintiff's husband on November 10, 2010 (Docket Entry 23-7); and

8) a copy of a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") signed by Plaintiff on September 23, 2008 (Docket Entry 23-9).

Plaintiff responded in opposition (Docket Entry 26) and attached thereto:

1) two affidavits from Plaintiff dated December 17, 2010, and an unsigned EEOC Charge of Discrimination form dated September 19, 2008 (Docket Entry 26-1);

2) Plaintiff's responses to Defendant's first set of interrogatories and requests for production of documents dated June 21, 2010 (Docket Entry 26-2);

3) a transcript of Plaintiff's deposition from October 19 and November 9, 2010 (Docket Entries 26-3 through 26-10);

4) a transcript of the deposition of Plaintiff's husband from November 10, 2010 (Docket Entry 26-11);

5) a transcript of the deposition of William Gary Burris, Jr. (the friend of Plaintiff and her husband who was involved in the March 2008 altercation at Harmanco's Restaurant) from October 25, 2010 (Docket Entry 26-12); and

6) affidavits from Plaintiff's sister, husband, father, and doctor, as well as from Burris, James Pope (an Albemarle Police Department detective and friend of Plaintiff's father), Suzie Shue (a former employee of Defendant), and Nonnie Luther (a friend of Plaintiff's) (Docket Entry 26-13).

Defendant filed a reply (Docket Entry 27), with a supplemental affidavit from Vice President Gibson (Docket Entry 27-1).

## FACTUAL BACKGROUND[4]

Plaintiff grew up in Stanly County, North Carolina. (Docket Entry 26-3 at 5.) She graduated from high school in 1991 and completed less than a year of college. (Id.) Plaintiff got

---

[4] As set out in the Discussion section, infra, p. 41, at this stage of the proceedings, the Court must view the record evidence in the light most favorable to Plaintiff; this factual summary reflects that perspective. However, recognition that the Court must construe the record in Plaintiff's favor does not relieve her of the obligation to present competent evidence; in particular, notwithstanding Plaintiff's view that information qualifies as "[her] personal knowledge because it's things that people have told [her]" (Docket Entry 26-9 at 19), Plaintiff may not rely on unsworn, out-of-court statements of others to establish the truth of the matter asserted unless she shows that an exception to the hearsay rule applies. See Maryland Highways Contractors Ass'n, Inc. v. State of Md., 933 F.2d 1246, 1251 (4th Cir. 1991) ("[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment.").

married in 1992.  (Id.)  In 1996, after working various cashier and clerical jobs, including a short stint as a part-time teller, Plaintiff became a customer service representative for Central Carolina Bank ("CCB").  (Id. at 8-9.)  Over the next few years, Plaintiff worked in a number of different CCB branches and moved into successively higher positions; by 2003, she had become the manager of CCB's branch in Norwood, North Carolina.  (Id. at 9-10.) "[T]he only complaint [Plaintiff] ever had with [that] job was [that she] wanted to be licensed to do [her] own investments . . ., [but that] was just not in the works . . . ."  (Id. at 11.)

Defendant "is a community bank with a customer base primarily in small towns in Stanly County and surrounding counties in North Carolina."  (Docket Entry 23-5 at 2.)  In 2004, President Lawhon "called [Plaintiff] and asked [her] if [she] would be interested in working [for Defendant]."  (Docket Entry 26-3 at 11.)  Plaintiff "met with [President Lawhon] and [Vice President Gibson], and [she] talked to [President Lawhon] several times on the telephone over the course of several months, and then [they] met and finalized everything."  (Id. at 12.)  Plaintiff accepted Defendant's offer to become "[t]he manager of [its] Norwood office" because Defendant would give her "[t]he opportunity to become licensed [in connection with the offering of investments]."  (Id.)[5]

---

[5] Defendant, in fact, paid for Plaintiff to go to Charlotte, North Carolina, for several weeks to study for and to take licensing examinations. (Docket Entry 26-3 at 13-14.)  In addition, by taking the job with Defendant, Plaintiff got "more lending authority" (id. at 12) and higher pay (id. at 14).

## Plaintiff Quickly Sours on Working for Defendant

Even early in her tenure with Defendant, Plaintiff was not
"happy," because she "started finding things out that [she] didn't
agree with . . . [like] the way women were treated differently."
(Id. at 17.)  Plaintiff "first s[aw] some evidence of [differential
treatment] . . . [w]hen [her uncle] asked [her] shortly after she
came to work [for Defendant] if Roger [Dick] had married the lady
that he had gotten knocked up." (Id.)  Dick was "[t]he CEO of the
holding company" to which Defendant and two other banks belonged
(Docket Entry 23-5 at 7; Docket Entry 26-5 at 8) and reported to
the holding company's board of directors (Docket Entry 23-5 at 7;
Docket Entry 26-6 at 6).  The woman in question was "an employee
[of Defendant]." (Docket Entry 26-3 at 18.)  Plaintiff never spoke
directly to CEO Dick or said woman about the matter and does not
know "what if anything happened between [them]." (Id. at 17-18.)[6]

In addition, President Lawhon made comments to Plaintiff about
when certain "older ladies [who worked in the Norwood office] were
going to retire" and how one such employee "made too much money to
not be a lending officer, and it was because she had been there so
long." (Docket Entry 26-7 at 14.)  According to her deposition
testimony, Plaintiff complained about these comments in a meeting

---

[6] Plaintiff also heard remarks about CEO Dick's affair from two co-workers,
Nanny Gray and Mike Harwood.  (Docket Entry 26-3 at 17, 19.)  She discussed the
matter with Senior Vice President McIntyre more than once, but could not say
which of them raised the subject, when these conversations occurred, or whether
she "wanted [him] to do something about this rumor." (Id. at 18.)  Plaintiff
asserted that, "[i]f [she] complained about [CEO] Dick, [she] would have been
fired," although she knew no one who had suffered that fate.  (Id. at 19-20.)

with President Lawhon and Vice President Gibson on March 26, 2008, and on unspecified prior occasions; however, she failed to describe the nature of her complaints.  (Docket Entry 26-10 at 2-3.)

Plaintiff also had the following experiences that she perceived as disparate treatment based on her gender:

1) in one meeting, Plaintiff "was the only woman, and [President Lawhon] said, 'I need somebody to take notes,' and they all looked at [Plaintiff] to take notes[,]' . . . [whereupon she] said, 'Just because I'm the only woman here doesn't mean I have to take notes,'" and she did not (Docket Entry 26-6 at 8);

2) "male employees were allowed to have outside employment,"[7] but, when Plaintiff's husband started a "tax office" in 2006, Vice President Gibson said Plaintiff "needed to just stay arm's length away from the company" (Docket Entry 26-7 at 13-14);

3) some male employees had "expense accounts to go take people to play golf," but Plaintiff (who "never tried" golf) lacked "an equivalent" (Docket Entry 26-9 at 15);[8] and

4) Defendant "allowed" "branch managers" and "senior vice presidents" to have "expense cards" and when she asked for such a card on various, unspecified occasions she was told "[she] would be getting one," but never did (id. at 15-16).

---

[7] As her basis for this claim, Plaintiff initially pointed to a male employee who "worked with his dad at the oil changing place that his dad owned." (Docket Entry 26-7 at 13.)  On the second day of her deposition, Plaintiff named two additional males employed by Defendant who had part-time jobs, one as a football coach and the other working on computers.  (Docket Entry 26-9 at 14-15.)

[8] Plaintiff did not ask Defendant for a specific "equivalent"; instead, she simply sought "ideas" from President Lawhon.  (Docket Entry 26-9 at 15.)

<u>Plaintiff Begins Having Panic Attacks in 2006</u>

In addition, Plaintiff had problems "[d]ealing with [President] Lawhon. . . . He was very hostile, very loud. . . . He jumped the gun on things. He didn't give you time to explain anything." (Docket Entry 26-4 at 2.) President Lawhon, however, did not single her out for such treatment, but also "direct[ed] his temper toward other people." (<u>Id.</u> at 3.)

Before coming to work for Defendant, Plaintiff "had general anxiety," but, during her tenure with Defendant, she began having "panic attacks associated with [President Lawhon]." (<u>Id.</u> at 2-3.)[9] When asked if he "did something . . . that caused [her] to have a reaction to him, Plaintiff explained that, after a meeting in December 2006, President Lawhon "brought [Plaintiff] in the office to talk about . . . an employee . . . that worked for [Plaintiff] . . . . [Plaintiff] relay[ed] the fact that [said employee] did not want to work the hours . . . that [President Lawhon] wanted [the employee] to work. [President Lawhon] was furious at that fact, and he started taking it out on [Plaintiff]." (<u>Id.</u> at 3-4.)

More specifically, President Lawhon "started cussing at [Plaintiff] and yelling, saying that he was going to . . . fire [the employee] and he was slamming his fists on the desk . . . ." (<u>Id.</u>) Plaintiff "started crying, and . . . said, 'You need to calm down.' He said, 'You don't tell me what to do.'" (<u>Id.</u> at 4.) President Lawhon "was just out of control and people outside could

_____

[9] Plaintiff was "on an anti-depressant before [she] started with [Defendant.]" (Docket Entry 26-4 at 5.)

hear him. And he just acted just completely outrageous to [Plaintiff], and [she] didn't know what to do." (Id.) "At one point, [Plaintiff] thought [President Lawhon] was going to stand up and hit [her]." (Id.) Plaintiff felt "so threatened that [she] told [him she] was leaving his office . . . ." (Id.)[10]

Plaintiff then "called [Vice President] Gibson." (Id.) During that conversation, Plaintiff reported that President Lawhon "scared [her]." (Id.) She thought about leaving her job and "probably" could have gone back to CCB, but chose to remain with Defendant. (Id.) Plaintiff drew satisfaction from the fact that, "in addition to sometimes getting mad at [her], [President Lawhon] also told [her] that [she] w[as] doing a good job[.]" (Id. at 5.) Ultimately, "[t]he raises" Plaintiff received each year "outweighed the concerns [she] had about working for [Defendant.]" (Id.)

---

[10] Again, Plaintiff was not alone in facing such an event; during this period, President Lawhon "was lashing out at a lot of people." (Docket Entry 26-4 at 4.) Indeed, Vice President Gibson told Plaintiff that other employees had reported "fearing that [President Lawhon] was going to have a heart attack because his temper was so bad and he was lashing out at people for no reason." (Id.) Plaintiff described only one other specific incident during her employment with Defendant when President Lawhon treated her in such a fashion, an occasion (the date of which she could not remember, but "that was probably maybe early 2006") in which President Lawhon "call[ed] [Plaintiff] on the phone . . . and yelled at [her] about funding a line of credit that . . . had not been renewed, . . . a very mild mistake . . . that [she] didn't realize [she] had done wrong." (Id. at 5.) President Lawhon "went off the deep end, screaming at [Plaintiff], . . . and he wouldn't let [her] explain." (Id.) Plaintiff's citation of this incident as occurring in "maybe early 2006" conflicts with other portions of her testimony: "Everything had been going fine with, you know, the – my employment started changing when my husband got hurt in September [2006] and when he became disabled. Whenever he became disabled, things started to decline. And when that happened is when [Defendant] started treating me differently. That's when I noticed that [President Lawhon] started treating me differently. And I felt like he – his tolerance for me – and I became one of the – those women that he would not tolerate as a manager for him anymore." (Docket Entry 26-9 at 16.)

Plaintiff's negative encounter with President Lawhon in December 2006 came shortly on the heels of her husband experiencing a serious accident while working construction in September 2006. (<u>Id.</u> at 6.) He suffered a broken leg, "all of the soft tissue in both of his legs were crushed," multiple disks in his back were "bulging or herniated," he "tore his shoulder," and "lost half of his hearing in both ears." (<u>Id.</u>) As a result, Plaintiff's husband spent a week in the hospital. (<u>Id.</u>) Plaintiff thereafter worked from home for some time to assist with his care. (<u>Id.</u> at 6-7.)

"It was almost a year before [Plaintiff's husband] went back to work." (Docket Entry 26-11 at 10.) Upon returning to the construction company that employed him at the time of his injury, Plaintiff's husband "buil[t] stuff for jobs . . . [and did] maintenance on the equipment." (<u>Id.</u>) However, his "legs were swelling real bad . . . [and he had] a lot of pain." (<u>Id.</u>) His doctor said he "needed to find something to use [his] mind more so than [his] body." (<u>Id.</u>) The construction company "tried to move [him] into the office there handling the insurance," but that required him to handle his own claim, which he considered "kind of like a slap in the face" and "kind of a conflict of interest." (<u>Id.</u>) In addition, he "wasn't used to the office environment [and] . . . didn't feel confident doing the job." (<u>Id.</u>)

When Plaintiff's husband told his supervisors that he "wasn't comfortable handling that position," they said "[t]hat they didn't have anything else that they could move [him] into." (<u>Id.</u>)

Plaintiff's husband then went "back on worker's comp . . . and work[ed] with a vocational therapist, trying to find employment, . . . [but] never did find a job." (Id. at 11.)[11] However, from late 2007 forward, he resumed doing "sign repairs" through JTS Sign Service (a company he and/or Plaintiff had formed "in 2000 or 2001"), primarily on an as-needed contract basis for Cadillac Sign. (Docket Entry 26-4 at 13; Docket Entry 26-11 at 11, 16.)

In her deposition, Plaintiff initially testified that her husband "has a lower grade of like a postramatic stress disorder" and has been diagnosed with "depression and anxiety," but that she did not know who made these diagnoses. (Docket Entry 26-4 at 14.) Later in her testimony, however, Plaintiff clarified that she "d[id]n't know exactly what [her husband's] diagnosis is, but [she] kn[e]w that he ha[d] been to see a psychiatrist or psychologist." (Docket Entry 26-8 at 17.) Plaintiff's husband was "not aware" he ever had "been diagnosed with a mental illness." (Docket Entry 26-11 at 13.) Diagnosis aside, according to Plaintiff, her husband "has rage issues. He has depression issues. He has tolerance issues and a lot of anxiety." (Docket Entry 26-8 at 18.) She attributed these "issues" to the fact that, in his accident, her

_____

[11] Plaintiff's husband received a "weekly" worker's compensation check until some time in 2009, when he entered into a "settlement," the terms of which he and Plaintiff refused to disclose due to a "confidentiality agreement." (Docket Entry 26-4 at 7; Docket Entry 26-11 at 5.) At some point, Plaintiff's husband had a "disability rating" that precluded "stoop[ing], bend[ing], [and] squat[ting]," but neither Plaintiff nor her husband knew if or when those limitations ceased to apply. (Docket Entry 26-4 at 13; Docket Entry 26-11 at 13-14.) Plaintiff's husband did confirm that, in late 2007, he "quit going to [physical] therapy." (Docket Entry 26-11 at 18.)

husband "was crushed by a 7,500 pound piece of machinery and stuck down in a 50-foot pit for 2-1/2 hours . . . ." (Id.)

Plaintiff's husband told President Lawhon about that experience during a social get-together in the summer of 2007. (Id.) In addition, "[t]here were continuous conversations that were had with [Plaintiff] throughout [her] employment from the time [her husband's accident] happened, and continuing into 2008, where [Vice President Gibson, President Lawhon, and CEO Dick] . . . would ask [Plaintiff] about [her] husband's condition . . . ." (Id. at 19.) When Plaintiff received inquiries of that sort, she generally would give an update about her husband's physical condition, such as whether he was walking with or without a cane, and, as to his "mental state," she would say, "'He has good days. He has bad days, but he still has nightmares,' that type of thing." (Id.)

Plaintiff Discovers Her Husband's Affair on December 5, 2007

On December 5, 2007, Plaintiff "found out [her] husband was having an affair." (Docket Entry 26-4 at 15.) She "had seen some changes in [her] husband, and [she] looked at the phone bill and saw . . . a number recurring over and over again. [Plaintiff] called the number and found out it was the girl that was his physical therapist at the hospital." (Id.) Plaintiff then telephoned the hospital and confirmed that the physical therapist in question "had [been] chang[ing] the schedule so she could have [Plaintiff's husband's physical therapy appointment] each time." (Id.) That afternoon, Plaintiff confronted her husband about the

-13-

issue and he admitted "that something _was_ going on [between him and the physical therapist] . . . ." (_Id._ at 16 (emphasis added).)[12]

Plaintiff "had suspicion prior to [December 5, 2007]" and, during that time, her "anxiety" had increased due to "thinking [her] husband was having an affair." (_Id._ at 15-16.) As a result, some time before December 5, 2007, Plaintiff visited her doctor, who prescribed a different antianxiety drug, Klonopin. (_Id._) Plaintiff took Klonopin on the afternoon of December 5, 2007. (_Id._ at 17.) That evening, she went to a bar, Pontiac Pointe, with her sister, where they met Plaintiff's co-worker, Tammie Aldrich. (_Id._ at 15-17.) While out with Aldrich, Plaintiff "usually dr[a]nk Malibu Bay Breeze[,] . . . a fruity drink . . . [with] rum . . . ." (_Id._ at 17.) Plaintiff does not remember how many drinks she had on the night of December 5, 2007, but "think[s] [she] had two

---

[12] In her deposition, Plaintiff attempted to construct a causal chain between her husband's work-place accident and his affair: "[H]is disability had really affected him a lot, and his disability mentally and physically had, I guess, made him decide to have an affair. I don't think that he – you know, he wouldn't have been at the hospital having physical therapy and wouldn't have been in that situation had he not been hurt. So he wouldn't have had an affair." (Docket Entry 26-9 at 16-17.) The final link in this causal chain remains in some doubt: Plaintiff's husband testified that he and his physical therapist "didn't have an affair" and had no "romantic," "sexual," or "emotional" relationship. (Docket Entry 26-11 at 16.) Moreover, according to Plaintiff's husband, when Plaintiff confronted him about his physical therapist, rather than admitting that "something was going on" (as Plaintiff claimed he did (Docket Entry 26-4 at 16)), he told Plaintiff that nothing untoward occurred. (Docket Entry 26-11 at 18.) Because Plaintiff takes the position that the affair took place and she has presented some evidence from which a reasonable fact-finder could draw that conclusion, the undersigned Magistrate Judge will assume the affair happened for purposes of resolving Defendant's summary judgment motion.

total, or three." (Id.) Plaintiff does "know [she] had more than one" and admitted that she "was tipsy." (Docket Entry 26-9 at 1.)[13]

At some point that evening, Plaintiff "started feeling [something] like vertigo." (Docket Entry 26-4 at 17.) She "felt like [she] could not walk." (Id. at 18.) Plaintiff's sister and Aldrich "thought that [Plaintiff] was drunk." (Id.) Plaintiff told them she "wasn't drunk, and [that she] had fallen and hit [her] head . . . in the bathroom." (Id.) Two men thereafter helped Plaintiff out of the bar and her sister drove her home. (Id. at 17-18.) Once home, Plaintiff went to sleep. (Id. at 18.)

### Plaintiff Gets Hospitalized on December 6, 2007

The next morning (December 6, 2007), Plaintiff got up and called a friend, Nonnie Luther, "[t]o tell her what was going on with [Plaintiff's] husband." (Id.) They made plans to meet at a park in downtown Norwood, after Plaintiff stopped by her office to "get anything that [she] needed taken care of . . . ." (Id. at 18-19.) They "were going to meet [at the park], get in one vehicle and go to Charlotte, Concord . . . [to] get away, and [Luther] was going to help [Plaintiff] sort things out." (Id. at 19.)

"Around 8:15, 8:30," Plaintiff drove to her office, went inside, and told Aldrich and another employee "[t]hat [she] was going to take the day off, but [that she] wanted to come in and make sure everything was taken care of." (Id.) At the time,

---

[13] Aldrich has averred that Plaintiff "was drinking when [Aldrich] arrived [and] . . . had already had too much to drink." (Docket Entry 23-2 at 3.) According to Plaintiff's sister, Plaintiff was not "intoxicated when [Aldrich] arrived." (Docket Entry 26-13 at 3.)

Plaintiff "had taken [her] prescription medication as prescribed"
and "was upset, but [she] was not impaired." (Docket Entry 26-8 at
21.) Aldrich viewed Plaintiff as "act[ing] somewhat strangely."
(Docket Entry 23-2 at 3.) Plaintiff "told [Aldrich] that she was
not going to work and that she was going home." (Id.) In addition,
Plaintiff "told [Aldrich] she had taken two pills that morning.
[Aldrich] knew that [Plaintiff] had told [Aldrich] the night before
that she had taken one pill, and so [Aldrich] asked [Plaintiff] if
she should be driving. [Plaintiff] said that she was okay." (Id.)

Plaintiff "did not leave the parking lot of [her office] for
some time, however, and several other employees went out to check
on her. They informed [Aldrich] that [Plaintiff] could not
communicate except to nod in answer to their questions that she was
fine." (Id.) Plaintiff thereafter left the bank and "went to the
park . . . and waited on [Luther]." (Docket Entry 26-4 at 19.)
Plaintiff has no memory of Luther ever arriving (because, based on
what Plaintiff's doctor told her, she had "a reaction to the
Klonopin"). (Id.) Plaintiff next remembers "opening her eyes and
looking around in the emergency room." (Id. at 19-20.)

According to Luther, when she encountered Plaintiff on the
morning of December 6, 2007, Plaintiff "was experiencing some
dizziness and appeared to be physically sick." (Docket Entry 26-13
at 30.) Luther spoke with Aldrich by telephone "about
[Plaintiff's] condition." (Id.) "[A]nother of [Plaintiff's]
friends called [Aldrich] and [Aldrich] learned that [Plaintiff]
. . . had said she had taken 10 pills and had drunk beer with the

pills." (Docket Entry 23-2 at 3.) Aldrich "called a doctor friend
and based on his advice went to pick [Plaintiff] up to take her to
the emergency room of Stanly Regional hospital, where she was
admitted." (Id.)[14] Plaintiff "reported to [Aldrich] that she was
not trying to kill herself, but that she just wanted to go to
sleep." (Id.)[15] Aldrich "spoke with [Vice President] Gibson and
[President] Lawhon about what [Aldrich] had observed." (Id.; see
also Docket Entry 23-3 at 3, 9; Docket Entry 23-5 at 3-4.)

Records Plaintiff obtained from the hospital include the
following hand-written note, dated December 6, 2007, 12:30 p.m.,
under the heading "'PRECIPITATING EVENTS'": "'Took 10 - 1
milligram Klonopin plus 6 beers (doesn't usually drink). Denies
SI. . . . Want to sleep. Husband having an affair. Not sleeping
well for 6 months. Fell yesterday and hit head yesterday at
Pontiac Pointe.'" (Docket Entry 26-5 at 1.) Another such record,
from "approximately the same time," documents that "'Patient
states: took approximately ten 1 milligram Klonopin in the last
hour and a half. Also reports having 3-4 beers this am. Patient
denies trying to harm herself. States she just wanted to go to

---

[14] Luther apparently had taken Plaintiff from the park to Luther's home.
(See Docket Entry 23-2 at 3; Docket Entry 26-5 at 6.)

[15] According to Luther, "[t]here was some confusion about [Plaintiff's] new
medication, and how much of the medication she had taken that day. There was
also some question as to whether she had been drinking beer." (Docket Entry 26-
13 at 30-31.) Plaintiff "had not been drinking that [Luther] was aware of
. . . [and Luther] did not believe that [Plaintiff] was intoxicated." (Id. at
31.) Although Luther "did not know how much medicine [Plaintiff] had taken,
[Luther] did not believe [Plaintiff] had intentionally overdosed." (Id.)

sleep, accompanied by friend.'" (Id. at 2.) A third hospital record contains this entry (from a half-hour after the first two):

> "Patient states she started drinking at 8:30 this morning and drank 6 beers. Patient took 10 Klonopin. Patient was alone when she took the pills. Patient denies suicide attempt, stating she simply wanted to sleep. A friend found patient and became concerned and brought her to the ED. Patient's husband has been having an affair. Patient states she is not herself and usually doesn't drink or miss work."

(Id. at 3.)[16] During her deposition, Plaintiff initially denied making any of the foregoing comments attributed to her in the hospital records; later, she acknowledged that she "could have said them, but [asserted] that these things [we]re not true." (Id.)

Hospital records also reflect that Plaintiff "agree[d] to a voluntary admission to [the hospital's psychiatric ward]." (Id.; see also Docket Entry 26-4 at 20; Docket Entry 26-5 at 5-6.) Plaintiff "recall[ed] signing a piece of paper, but [denied that] the [doctor] told [her she] was signing [a voluntary admission to the psychiatric ward]." (Docket Entry 26-5 at 3.) Instead, Plaintiff thought she had agreed to "'spiritual counseling' . . . because [the doctor] said counseling, and to [Plaintiff] counseling sometimes means spiritual counseling." (Id. at 5.) The next morning, according to hospital records, Plaintiff spoke with the same doctor who had admitted her to the psychiatric ward; at that time, Plaintiff "'admit[ted] to only taking up to 2 Klonopin [the

---

[16] The transcript of Plaintiff's deposition sets out this quotation in all capital letters, but standard capitalization appears here for ease of reading.

previous] morning at work.'" (<u>Id.</u> at 4.)[17] Plaintiff "said she wanted to go home, that she didn't need to be at the hospital." (Docket Entry 26-11 at 21.) Hospital records reflect that Plaintiff "'did not demonstrate behavior consistent with involuntary commitment and therefore arrangements were made for discharge.'" (Docket Entry 26-5 at 4.)

<u>Plaintiff Meets with Defendant's Officials on December 10, 2007</u>

On December 10, 2007, Plaintiff called Vice President Gibson to discuss "how [Plaintiff] had been treated at the hospital . . . and the fact that [the hospital] had a harlot that was sleeping around with [her] husband . . . ." (<u>Id.</u> at 7-8.) They "talked about the fact that [President] Lawhon was on the board at the hospital . . . and decided [to] meet with [him, CEO Dick, and Brendan Duffy (an employee of Defendant)] . . . ." (<u>Id.</u> at 7.) During that meeting, Plaintiff talked about suing the hospital and CEO Dick "said he was tired of seeing people sue each other and that [people] should go back to how it used to be," i.e.: "When a neighbor's dog shits in your yard, you should go over to your neighbor and tell your neighbor, 'Your dog shit in my yard. What are you going to do about it? Come clean it up.'" (<u>Id.</u> at 8.)

Plaintiff felt CEO Dick "was letting [her] know that's how [she] needed to handle it and not go try to sue the hospital." (<u>Id.</u>) According to Plaintiff, given CEO Dick's "position, it was

_____

[17] According to Plaintiff's husband, the doctor reported that "the tox screen" done on Plaintiff "was negative" and theorized that her depression "just locked her down." (Docket Entry 26-11 at 20-21.)

unlawful for him to say what he said." (Id.) "[F]irst of all, what he was saying was nasty. It's not something [she] wanted to hear about." (Id.) In addition, "it was also kind of a forceful thing that he was saying to [Plaintiff]. He was letting [Plaintiff] know very much what he expected [her] to do." (Id.) In Plaintiff's view, CEO Dick's expression of an expectation of that sort to her was "discriminatory." (Id. at 9.) She later added that "[t]he comment [CEO] Dick had made to [her] . . . about the hospital and if a dog shits in your yard . . . wasn't appropriate . . . and [she] considered all of that sexual discrimination." (Docket Entry 26-8 at 13.)[18]

On the first day of her deposition, Plaintiff had an opportunity to describe "anything else about that meeting [on December 10, 2007] . . . with regard to what might have been said to [her] or concerns [she] had about [Defendant's] treatment of [her] in that meeting," but offered nothing further. (Id. at 10.) However, on the second day of her deposition, when questioned about certain allegations in her Complaint, Plaintiff asserted that she also objected to comments by CEO Dick, President Lawhon, and Vice President Gibson during the meeting on December 10, 2007, regarding Plaintiff's plan to have weight-reduction surgery. (Docket Entry

_____

[18] Plaintiff did meet with officials from the hospital "and let them know [her] concerns . . . ." (Docket Entry 26-5 at 9-10.) The hospital officials responded "[t]hat they would look into it and get with [Plaintiff] on [December 14, 2007]." (Id. at 10.) On December 14, 2007, the hospital officials gave Plaintiff a form she could use to file "a complaint about [her] medical records" and stated that they "were going to look into the [physical therapist,] . . . [but that] [i]t was a personnel issue they couldn't discuss with [Plaintiff]." (Id.) Plaintiff did not decide to sue the hospital. (Id.)

26-8 at 10-11.)  "[T]hey tried to discourage it because they were talking about having all the plastic surgery that [she] would have to have afterwards and again talking to [her] about the beauty related to it.  It was just a very awkward conversation . . . ."  (<u>Id.</u> at 10.)[19]  According to Plaintiff, "the conversation in general . . . and the way they approached that conversation was sexual discrimination to [Plaintiff]."  (<u>Id.</u> at 13.)[20]

At the end of the meeting on December 10, 2007, Duffy commented "that it was almost Christmastime, and he knew [Plaintiff] had been going through a lot, and . . . suggested that [she] take some time off."  (Docket Entry 26-5 at 9.)  Plaintiff "was grateful" for the offer "to take time off to get . . . things settled in [her] personal life . . . ."  (<u>Id.</u>)  According to Plaintiff, Duffy's comments acknowledging her need to take time off and Duffy's remark that Plaintiff's "husband probably need[ed]" her, as well as related discussion about the fact that her husband

_____

[19] The references to "beauty" consisted of CEO Dick "stating [she] was very beautiful . . . and [he] didn't understand why [she] wanted to have surgery, and [President] Lawhon making the comment about having to have multiple surgeries afterwards to get rid of excess skin . . . ."  (Docket Entry 26-8 at 11.)

[20] Plaintiff elaborated that she did not think "being told [she was] beautiful . . . in a business setting . . . [was] appropriate . . . [or that] [b]eing told that [she] would need to have multiple plastic surgeries afterwards . . . was appropriate.  [She] thought that was sexual discrimination on both parts."  (Docket Entry 26-8 at 13.)  In addition, Plaintiff claimed that this discussion represented another example of Defendant's differential treatment of men and women; in support of this assertion, Plaintiff stated that a male employee of Defendant had weight-reduction surgery and that she "d[id]n't think they had had [sic] this type of conversation with [him] . . . ."  (Docket Entry 26-8 at 10.)  Plaintiff, however, admitted that she had no personal knowledge about what conversations Defendant's officials had with said male employee.  (<u>Id.</u>)  Defendant's comments did not dissuade Plaintiff from her plan; she had weight-reduction surgery in February 2008.  (Docket Entry 26-5 at 15.)

"had depression, anxiety, that type of thing" showed that Defendant knew her husband had a "disability." (Docket Entry 26-8 at 14.)

**Plaintiff Meets with Defendant's Officials
and Gets Hospitalized on January 3, 2008**

In the days leading up to Christmas, Plaintiff "continued to work," but also "took some time off." (Docket Entry 26-5 at 9.) After the holidays, when she "came back to work [on January 3, 2008], [Plaintiff] met with [Vice President Gibson] and [President Lawhon] and was told that the numbers were not good for [the] Norwood [office]." (Id. at 11.) "[Plaintiff] wanted [President Lawhon] to be more specific, and he started talking about he knew that [her] personal life had been a problem and that these were things that they were going to talk to [her about] prior to [her] having so many personal problems." (Id. at 11-12.) President Lawhon told Plaintiff "[h]e was moving [her] . . . [t]o the main office." (Id. at 13.) She "began having a panic attack then and shut down most of what he said from that point on." (Id.)[21]

---

[21] Plaintiff understood President Lawhon's reference to her personal problems as relating to "the depression that [she] suffered the whole time [she had] been working [for Defendant], including the time that [she] w[as] hospitalized in December 2007 and related to [her] husband's injury[.]" (Docket Entry 26-5 at 12.) President Lawhon, however, did not make any specific comments about such matters. (Id.) On the second day of her deposition, Plaintiff asserted that President Lawhon referred to her "family problems," rather than her "personal problems." (Docket Entry 26-8 at 20; Docket Entry 26-9 at 1-2.) According to Plaintiff, her husband's affair with his physical therapist constituted a "family problem" and therefore that affair represented "one of the reasons why [Defendant] moved [her to its main office]." (Docket Entry 26-8 at 20.) President Lawhon averred that Plaintiff's "performance as a branch manager . . . suffered during the fall of 2007. Based on that performance and the incidents [on December 5 and 6, 2007] involving public behavior that did not reflect well on [Plaintiff] as an officer of [Defendant], [he] and others in a leadership role with [Defendant] made the decision to move [her] . . . to the
(continued...)

Plaintiff was "very upset and very angry, and . . . ask[ed] for a copy of the meeting . . . [and] if [she] could leave to go home." (Id.)  She then went to see a doctor, who "ran a couple of tests . . . [before] admitt[ing] her to the hospital" due to "[s]evere depression, stress and anxiety." (Id. at 13-14.)  The next day, hospital officials "admitted [Plaintiff] into the Partial Program," which meant that, "[i]nstead of putting [her] in a confined psychiatric ward, [she went] from 9:00 [a.m.] to 2:00 p.m. and ha[d] therapy, group therapy, and [she] [would] meet with a psychiatrist to go over [her] medications . . . ." (Id. at 14.) Plaintiff did not return to work in January 2008. (Id.)  The Partial Program helped Plaintiff, including by giving her "coping skills and other things to be able to deal with the stress in [her] personal and professional life . . . ." (Id.)  Plaintiff determined that she needed to "[e]ither find another job or deal with the problems [she] had [in her job with Defendant]." (Id.)

In February 2008, Plaintiff "[w]ent back to work and . . . [t]hings were moved [from her office in Norwood] to the main office . . . [so she could] handle [her] customers in Norwood and . . . be retrained in commercial lending and SBA lending at the main office." (Id.)  Plaintiff "tried to have a positive attitude about

_____

[21](...continued)
main office . . . .  [President Lawhon] believed [Plaintiff] needed to refocus on her performance in a work environment without the daily stress of managing the [Norwood] office staff . . . [and] to obtain additional training." (Docket Entry 23-5 at 4.)  In the meeting on January 3, 2008, President Lawhon and Vice President Gibson "told [Plaintiff] that [they] were concerned that personal issues were getting in the way of her performance and told her that [Defendant] wanted her to re-focus her attention on her job as a banker." (Id. at 4-5.)

[the transfer]" (id.), but (despite the fact that she remained a Vice President of Defendant and received the same pay), Plaintiff considered the transfer a demotion, because she no longer served as a branch manager (Docket Entry 23-5 at 5; Docket Entry 26-8 at 16).

## An Altercation Occurs at Harmanco's Restaurant on March 15, 2008

On March 15, 2008, as they did about every other weekend, Plaintiff and her husband went to Harmanco's Restaurant to meet friends, including Burris (who worked for Cadillac Sign, the company for which Plaintiff's husband did contract work). (Docket Entry 26-5 at 15-16.)[22] After Plaintiff and her husband arrived, the group "just all stood up there at the bar or whatever and talked to everybody that's there and carried on and drank." (Docket Entry 26-12 at 14.)[23] At the end of the evening, Plaintiff, her husband, and Burris "were sitting at the bar . . . [and] were all getting ready to leave." (Docket Entry 26-5 at 16.)[24] Plaintiff and Burris each went to the rest room and Plaintiff's husband paid the bill and walked out to the parking lot. (Id.; Docket Entry 26-11 at 24-25; Docket Entry 26-12 at 14-15.)

---

[22] According to Plaintiff's husband, he and Plaintiff arrived around 9:00 p.m. (Docket Entry 26-11 at 24.)

[23] Plaintiff could not "remember if [she] drank that night." (Docket Entry 26-5 at 20.) Burris testified that Plaintiff drank that night, although he did not know how much. (Docket Entry 26-12 at 24.) Plaintiff's husband reported that, "[u]sually, she would drink a beer or . . . a glass of wine." (Docket Entry 26-11 at 24.) Burris estimated that he drank "[p]robably six or eight beers, maybe more[,] . . . [and that Plaintiff's husband drank] [p]robably the same or more." (Docket Entry 26-12 at 23.) Plaintiff's husband testified that he "probably had a couple of beers, as usual." (Docket Entry 26-11 at 24.)

[24] Burris placed the time at 1:00 or 2:00 a.m. (Docket Entry 26-12 at 13.)

"When [Plaintiff] came out of the rest room, [Burris] had come out of the men's room and [Plaintiff] stopped in and pulled [Burris] over to the side to talk to him." (Docket Entry 26-5 at 16.) At that same time, after waiting "a minute or so" out by his car, Plaintiff's husband went back inside to look for Plaintiff at the bar. (Docket Entry 26-11 at 25.) Upon failing to locate her there, he went "to see if she was . . . still at the bathroom, and that's when he saw [Plaintiff and Burris] . . . talking." (Id.)

Plaintiff's husband previously had noticed that Plaintiff "knew things [about his activities, such as his telephone contact with his physical therapist,] that only [Burris] would have known . . . [b]ecause [they] had worked together . . . ." (Id. at 18.) As a result, Plaintiff's husband developed a "gut feeling" that Plaintiff and Burris were talking to each other; he then confirmed this suspicion by looking at telephone records. (Id. at 17-18.)[25] Plaintiff's husband had never spoken with his wife or Burris about their telephone conversations, but – when he saw them talking together in the restroom corridor – something "clicked" and he "put two and two together." (Id. at 24-25.) More specifically, "insecurities" Plaintiff's husband had about "something going on" with his wife "finally just c[a]me out" and he "thought that there was more going on than [Plaintiff and Burris] just . . . shooting the breeze on the telephone here and there." (Id.)

---

[25] In fact, Plaintiff and Burris had "bec[o]me very close . . . because [she] called on him to find out if [her] husband was still cheating on [her]." (Docket Entry 26-5 at 19.) Burris gave Plaintiff sympathetic support when she needed it. (Id.) However, they had not engaged in sex. (Id. at 17.)

-25-

At that moment, Plaintiff's husband "lost it and went in there and took care of business and left." (Id. at 24.) In other words, he charged Plaintiff and Burris, "threw a punch and throwed [sic] them through the bathroom door and commenced to beating on them." (Id. at 25; see also Docket Entry 26-5 at 16; Docket Entry 26-12 at 17.) Plaintiff's husband landed the first punch on Burris's ear, but Burris blocked the succeeding blows, at which point Plaintiff's husband "went to hitting [Plaintiff]." (Docket Entry 26-12 at 16; see also Docket Entry 26-5 at 17-18.) Plaintiff's husband "walked out when [an employee of Harmanco's] came in the bathroom and said she was calling the cops." (Docket Entry 26-5 at 18.)[26] Plaintiff "asked her to please call the cops, and she asked [Plaintiff] to leave." (Id.) Plaintiff "went over to the phone and [the employee] asked [her] to leave, and [she] didn't understand why [the employee] wanted [her] to leave." (Id.)

Sandy Hinson, the Manager of Harmanco's, has given an account of the foregoing events that differs in some material respects. (See Docket Entry 23-4.) In particular, she averred:

> I went to the door of the women's restroom while [Plaintiff's husband] was still in there. He had hit Bill Burris and [Plaintiff] was yelling at the two men to stop. [Plaintiff's] clothing and hair were messed up and she was trying to straighten her clothing. Mr. Burris had blood on his face. At that point I told them that they needed to leave the restaurant and not come back or I would call the police. When I went into the women's

---

[26] Plaintiff's husband testified that he "was leaving anyway" and "was coming down the hallway there at the bathrooms," when the restaurant employee "[t]old [them] to leave." (Docket Entry 26-11 at 26.) Plaintiff and Burris maintained that they and Plaintiff's husband were inside the restroom when the employee arrived. (Docket Entry 26-5 at 18; Docket Entry 26-12 at 18.)

restroom, [Plaintiff's husband] appeared to pull Mr. Burris out of the third stall, where Mr. Burris and [Plaintiff] had been, where there was blood on the wall and structural damage to the stall itself. He yelled at [Plaintiff] something to the effect that that [sic] he could not believe she was doing what she was doing with Mr. Burris after 12 years of marriage. He said he could not believe she was giving Mr. Burris a "nub job." He yelled at Bill Burris to stop doing what he was doing. I remember this in detail because a young employee of the restaurant asked other customers what the term "nub job" meant.

(Id. at 2-3 (emphasis added).)

In her deposition, Plaintiff denied that she "ever kissed" or "ever had sex of any kind" with Burris. (Docket Entry 26-6 at 3.) In addition, in a subsequent affidavit, Plaintiff disputed Manager Hinson's foregoing account as follows:

The statements in the Affidavit of [Manager Hinson] are not correct. She was not a witness to any of my husband's confrontation with either Bill Burris or me. She did not even come back to the area where the incident occurred that night. I did see her in the bar area after the incident and I asked her if she would call the police. She was unwilling to do so. What is stated in her Affidavit about the incident at Harmanco's is incorrect.

(Docket Entry 26-1 at 15.) During his deposition, Burris similarly denied that "any sexual activity or conduct at all occurred . . . in the vicinity of th[e] rest room [at Harmanco's]." (Docket Entry 26-12 at 19.) He also submitted a subsequent affidavit asserting that Manager Hinson "did not come to the area where the incident occurred that night" and that Plaintiff's husband "did not make the statement which [Manager Hinson] suggests he may have made, or anything similar to it." (Docket Entry 26-13 at 12.) Plaintiff's husband also averred as follows: "[Manager Hinson] did not come to

the area where the incident occurred that night.  I did not make
the statement which [Manager] Hinson suggests I may have made, or
anything similar to it."  (Id. at 9.)[27]

<u>Plaintiff and Her Husband Separate, Then Reconcile
and Defendant Learns about the Altercation at Harmanco's</u>

After the altercation, Plaintiff left Harmanco's with her
husband, who "continued to hit [her] on the way home . . . [while]
muttering profanities."  (Docket Entry 26-5 at 18.)[28]  Once home,
Plaintiff's husband "packed up his stuff and he left."  (Id.)  The
next day, he returned and they "had a big argument," during which
he "accused [her] of having a relationship with Mr. Burris[.]"
(Id. at 20.)  Plaintiff and her husband remained separated at that
time.  (Docket Entry 26-11 at 30.)

Also on March 16, 2008, Manager Hinson "called the then-owner
of [Harmanco's], Tommy Boudoin, and told him . . . it appeared that
[Plaintiff] and Mr. Burris had been engaging in sexual activity in
the restaurant's bathroom, that there had been a fight and that

_____

[27] Plaintiff, her husband, and Burris contend that an employee of
Harmanco's other than Manager Hinson came back to the area where the altercation
occurred, but that said employee did not witness the altercation.  (Docket Entry
26-1 at 15; Docket Entry 26-13 at 8-9, 11-12.)

[28] In her deposition, Plaintiff initially testified that her husband
previously had struck her "[m]aybe four or five times . . . over the course of
[their] marriage."  (Docket Entry 26-5 at 20.)  When the deposition reconvened
at a later date, Plaintiff testified that only "one incident of domestic violence
[occurred] prior to the Harmanco's incident . . . .  It was one incident, but
[her husband] hit [her] several times."  (Docket Entry 26-9 at 4.)  She then
further clarified that the prior incident (which transpired in 1994 or 1995) "was
a shoving match" and agreed that "he hadn't hit [her] four or five times.  He had
just shoved [her] four or five times[.]"  (Id.)  Plaintiff's husband denied ever
previously striking or shoving Plaintiff, although he acknowledged that she once
had fallen down while backing away from him.  (Docket Entry 26-11 at 28.)

[she] had asked them to leave." (Docket Entry 23-4 at 3.) By the next day, "news of the incident had spread and [Manager Hinson] heard about it from other people both when [she] went to Wal-Mart and in the restaurant. A number of those people, too, identified [Plaintiff] as someone who worked for [Defendant]." (Id.)

That same day, Plaintiff told President Lawhon and Vice President Gibson "that [her] husband had hit [her] and got in an altercation at Harmanco's." (Docket Entry 26-6 at 1.)[29] "They offered the employee assistance program . . . [and President Lawhon] said [Plaintiff] needed . . . to file charges against [her husband]." (Id.) Plaintiff "showed [President Lawhon] [her] bruise, and he said, 'Any man that does that to a woman needs to go to jail.'" (Id.) Over the next several days, Plaintiff met with an attorney and spoke to a law enforcement officer, but did not take any formal action against her husband. (Id. at 1-2.)

Later in the week, President Lawhon heard additional details about the altercation at Harmanco's (which was a customer of Defendant). (Docket Entry 23-5 at 5.) First, Senior Vice President McIntyre reported that he had a conversation with "a banker from another local bank . . . [who] [i]n a competitive, joking manner . . . sa[id] that [Plaintiff] and others had been kicked out of [Harmanco's] after she supposedly engaged in sexual activities in a restroom with a man who was not her husband, and

---

[29] In Plaintiff's view, Defendant "should have known" that "the reason [her] husband hit [her and Burris] in 2008 was because of [conditions arising from his work-place accident] in 2006[.]" (Docket Entry 26-7 at 3.)

that her husband had fought with the other man." (Docket Entry 23-6 at 2-3.)[30]  President Lawhon then followed up as follows:

> After I heard about this report, I spoke with Tommy Boudoin, owner of Harmanco's.  Mr. Boudoin had spoken to the manager of Harmanco's and confirmed the story that I had heard.  My understanding after speaking with Mr. Boudoin was that [Plaintiff] and a man identified as Bill Burris reportedly were in a restroom together at Harmanco's, that [Plaintiff's husband] found them and had then gotten into a fight in the restroom.  The fight involved Mr. Burris, [Plaintiff's husband] and [Plaintiff].  I understood that the manager of Harmanco's had ordered all three individuals to leave that night and not return to the restaurant.

(Docket Entry 23-5 at 5.)

On March 20, 2008, Plaintiff's father "called [her] and said that [her husband] was on his way over to [their] house to get his things . . . ."  (Docket Entry 26-6 at 2.)  Plaintiff then told President Lawhon:

> "[My husband] is on his way to my house, and I need to leave."
>
> And he said, "Are you going to call the police now?"
>
> And [she] said, "Yeah.  I'm going to call the police."
>
> He said, "All right.  Are you coming back?"
>
> And [she] said, "No, I won't be back today" because it was at 3:30 when [Plaintiff] was leaving.
>
> He said, "Well, you need to call the police."
>
> And [she] said, "Okay.  I'm going to call the police."

---

[30] According to a memorandum dated "March 17, 2008, March 20, 2008" that Vice President Gibson placed in Plaintiff's personnel file, it appears that President Lawhon first received information of this sort around March 19, 2008. (See Docket Entry 23-3 at 15.)

(Id.) Plaintiff, however, did not call the police, but instead met with her husband and her father. (Id. at 2-3.) At that time, Plaintiff and her husband decided to reconcile. (Id. at 3.)[31]

### Plaintiff Meets with Defendant's Officials on March 26, 2008

"On [March 26, 2008], [Plaintiff] was called in for a meeting [with President Lawhon and Vice President Gibson]." (Id. at 4.) In the meeting, President Lawhon "began talking to [Plaintiff] about what had taken place at Harmanco's." (Id.) "He said he had heard from several sources that, basically, [Plaintiff] was having sex in the bathroom with Bill Burris, that it had caused a fight, and he didn't like the way that looked, and he was putting [Plaintiff] on probation because of this and [her] other problems." (Id.) President Lawhon informed Plaintiff that she was "[n]ot to be seen in public with [her] husband . . . [during the] 90 days probation. And then he asked [her] if [she] had filed charges against [her] husband yet." (Id.)

In her deposition, Plaintiff initially testified that, in response, "[she] told [President Lawhon] that when [she] had left work on [March 20, 2008] . . . [she] went to file charges against [her] husband. That was [her] intention. [She] went to the sheriff's department, but . . . [she] talked to [her] dad, and she felt safe that [her] dad was going to be there [when her husband came to their house] and so [she] didn't [file charges]." (Id.) However, when asked a second time how she responded to President

---

[31] Upon reconciling, Plaintiff and her husband "agreed" her "relationship with [Burris] . . . was too close . . . ." (Docket Entry 26-5 at 19.)

Lawhon's question, "'Did you call the police,'" Plaintiff testified she told him that "[i]t was none of his business." (Id. at 5.)

At President Lawhon's direction, Vice President Gibson then "read [Defendant's] code of ethics to [Plaintiff]." (Id. at 6.)[32] Plaintiff understood that "they were implying that [she] had broke [sic] the code of ethics." (Id.) Plaintiff told President Lawhon and Vice President Gibson that "the stories . . . they had heard about [Plaintiff] having sex with Mr. Burris in the bathroom at Harmanco's . . . were a lie." (Id.) Plaintiff also informed President Lawhon and Vice President Gibson that she "thought they were treating [her] unfairly and discriminating against . . . [her, but she did not] explain what [she] meant by that . . . [except to say] [t]hat others were treated differently than [she] was in the same predicament or similar predicament." (Id.) Plaintiff did not identify any such "others" to President Lawhon and Vice President Gibson, but asserted that "[t]hey knew what [she] meant." (Id.) More specifically, according to Plaintiff, by "turn[ing] their heads," when Plaintiff made the foregoing statement, President

---

[32] During her employment, Plaintiff received and had access to that code (Docket Entry 26-3 at 16-17; see also Docket Entry 23-3 at 20), which included these provisions:  1) "To our customers, many of whom are shareholders, you are [Defendant] and for this reason you are expected to maintain a high standard of personal behavior in the office and out.  We ask that you conduct yourself and your personal affairs in a manner that will reflect positively on you and [Defendant]."  (Docket Entry 23-3 at 23.); and 2) "The conduct of business and private life of each director, officer and associate should reflect favorably on the institution and fellow associates.  A reputation for good morals, ethics, and integrity is within the reach of all, and each member of [Defendant] must remain above reproach.  Ethical, moral and legal behavior are the responsibility of the individual director, officer and associate.  This institution will expect any director, officer or associate to not perform any act contrary to his or her ethical or moral standards, or to any laws or regulations."  (Id. at 28.)

Lawhon and Vice President Gibson indicated that "[t]hey knew [she] was referring to [CEO Dick]." (Id.)[33]

At that point, Plaintiff "said, 'Basically, you're asking me to leave.'" (Id. at 10.) President Lawhon and Vice President Gibson "said, 'We're not asking you to resign. We're just talking about probation.'" (Id. at 11.) However, President Lawhon also "said if [Plaintiff] wanted to leave, that was up to [her]" and then stated: "'[Vice President Gibson], can you type up a resignation letter for her.'" (Id. at 10.) After Vice President Gibson drafted a resignation letter, Plaintiff "signed it and [she] tore it up and handed it back to [President Lawhon]." (Id. at 11.) President Lawhon and Vice President Gibson then "told [Plaintiff] to go home and come back the next day and they would talk about it more." (Id. at 12.) Plaintiff "hoped that [she] may have a chance to keep her job if [President Lawhon and Vice President Gibson] were telling her to come back the next day." (Id. at 13.)

Plaintiff thereafter "went to eat lunch with [her] husband [at a local restaurant]." (Id. at 12.) At the restaurant, she "saw

_____

[33] On the second day of her deposition, Plaintiff added that she also told President Lawhon and Vice President Gibson that she "was being discriminated against because [she] was being held accountable for something [she] couldn't control, [her husband's] actions, because he was . . . disabled . . . ." (Docket Entry 26-9 at 6.) Plaintiff "reminded [President Lawhon] that [her] husband had been in an accident . . . and that's why things happened the way they did [at Harmanco's]." President Lawhon did not accept that explanation for the altercation, because "he tended to believe the rumors he had heard" about Plaintiff's role in instigating the incident by engaging in a sex act with Burris in the rest room. (Id. at 7; see also id. at 16 ("The Harmanco's incident happened where, basically, they didn't believe me. They believed what people in the community were saying . . . .").) As a result, President Lawhon remained committed to "putting [Plaintiff] on probation." (Id. at 7.)

-33-

[Senior Vice President] McIntyre . . . [and] told him what had taken place at the bank earlier." (Id.) More specifically, Plaintiff characterized those events as follows: "[Defendant] was basically asking for my resignation . . . [b]ecause of what had taken place at Harmanco's." (Id.) Senior Vice President McIntyre "laughed and said, 'That's odd considering what goes on with [CEO Dick and the female employee of Defendant with whom he had an affair] and David Williams and Mike Harwood and some of the other people that have worked there and their personal lives.'" (Id.) Plaintiff "said the same thing back to him." (Id.)[34]

---

[34] Plaintiff had heard "[r]umors going around about [Williams] and . . . a client [once told her] that [Williams] had been at Piney Point Golf Club, drunk and bragging about being on [Defendant's] time clock and getting paid to play golf." (Docket Entry 26-3 at 20.) Plaintiff "reported [that matter] to [Vice President] Gibson and [President] Lawhon." (Id.) Upon hearing the report, President Lawhon "had a tirade about the fact that [Williams] was still on the payroll of [Defendant] and not working and trying to get disability." (Id.) President Lawhon "said he hated" the way Williams had behaved in public, but "kept talking about the fact that [CEO Dick] was going to probably keep [Williams] on the payroll until he got disability . . . ." (Docket Entry 26-4 at 1.) Plaintiff has no knowledge about any personnel action taken regarding Williams (id.) or even if he actually worked for Defendant (and thus reported to President Lawhon), as opposed to the larger holding company (over which CEO Dick presided) (Docket Entry 26-7 at 12). On the second day of her deposition, Plaintiff added that "[p]eople have told [her] over and over again" that Williams "was in an extramarital affair"; however, apart from her conclusory assertion that "[t]he whole community knows about it," Plaintiff cited no evidence of Defendant's knowledge of this matter (or, if Defendant had such knowledge and Williams actually worked for Defendant, how Defendant reacted). (Docket Entry 26-9 at 18-19.) Harwood's alleged personal foibles apparently consisted of the fact that "people had talked about him having extramarital affairs" and that he "kind of hit on [Plaintiff] one time before [she] came to work at [Defendant]." (Docket Entry 26-10 at 1.) Plaintiff did not testify that she reported the latter or that President Lawhon had received information he credited as to the former. (See id.) As to the "other people" employed by Defendant with problems in their "personal lives" that she and Senior Vice President McIntyre discussed (Docket Entry 26-6 at 12), Plaintiff identified only Don Davis (who drank on the job) (Docket Entry 26-10 at 2). Plaintiff had no information about what, if any, personnel action Defendant took regarding Davis. (Docket Entry 26-10 at 2.)

-34-

At the conclusion of their conversation, Senior Vice President McIntyre "said [Plaintiff] had a good job and [she] should try to work things out with [Defendant] because [she] told him [she] was supposed to go back the next day." (<u>Id.</u>) "When [Senior Vice President McIntyre] returned to work from lunch, [he] told [President] Lawhon that [he] had seen [Plaintiff] at lunch and that she had announced to him that she was planning to resign." (Docket Entry 23-6 at 3.)[35] "Based on that information, [President Lawhon] arranged, pursuant to usual [Defendant's] practice, to remove confidential [Defendant] and client information from [Plaintiff's] office." (Docket Entry 23-5 at 6.)

### Plaintiff Meets with Defendant's Officials on March 27, 2008 and Signs a Resignation Letter on April 1, 2008

On the morning of March 27, 2008, Plaintiff went to her office and "saw that everything had been cleared off [her] desk." (Docket Entry 26-6 at 13.) She then "went to [Vice President Gibson's] office . . . [and] asked . . . why [her] things were gone." (<u>Id.</u> at 13-14.) Vice President Gibson responded by saying "[s]omething about the conversation [Plaintiff had] with [Senior Vice President] McIntyre." (<u>Id.</u> at 14.) "[W]hen [President Lawhon] came in," Vice President Gibson "said that 'She's decided to leave.'" (<u>Id.</u>) Plaintiff then "told them that they wanted [her] to leave." (<u>Id.</u>)

---

[35] Plaintiff has denied that she told Senior Vice President McIntyre, "'I think I just quit my job'" (Docket Entry 26-6 at 12), but she has not disputed that he "<u>told [President] Lawhon</u> that . . . [Plaintiff] announced to [him] that she was planning to resign" (Docket Entry 23-6 at 3 (emphasis added)).

President Lawhon replied "[t]hat he understood that [Plaintiff] had left the day before and that's why [her] desk was cleaned off." (Id.) Plaintiff "was upset" about that and "felt betrayed" by Senior Vice President McIntyre. (Id. at 15-16.) President Lawhon and Vice President Gibson "never told [Plaintiff] [she] was fired." (Id. at 16.) However, in Plaintiff's view, "[t]hey used body language and tone to let [her] know that they did not want [her] working there anymore." (Id.) Further discussion ensued and President Lawhon said Plaintiff "would not get [her] personal items nor be paid for vacation pay if [she] didn't sign [a resignation letter]." (Id. at 18.)[36]

On April 1, 2008, Plaintiff signed a letter that provided: "'My resignation will be effective as of 4-30-2008.'" (Id. at 17-18.) Plaintiff did no work for Defendant after March 26, 2008, but Defendant paid her through April 30, 2008. (Id.) On April 8, 2008, Plaintiff visited her mental health counselor, whose record of the appointment included this summary:

> "[Plaintiff] reports today that <u>her husband did learn of a relationship she had with someone else and that there was a physical altercation between that individual and her [husband] out in public</u>. <u>This led to her employer talking to her about this incident.</u> She comes from a very small home town. <u>Client elected to leave her employer because of the questions . . . [the employer] was asking.</u> Client has talked to her spouse about the disappointment in his relationship with someone else."

(Id. at 19 (emphasis added).)

---

[36] Plaintiff does not know if she had any accrued vacation time at that point. (Docket Entry 26-6 at 18.)

<u>Plaintiff Files an EEOC Charge in September 2008</u>

On September 23, 2008, Plaintiff signed and (based on the stamp affixed thereto) submitted to the EEOC's Charlotte Office a Charge of Discrimination. (Docket Entry 23-9 at 2.) Said Charge alleges that Defendant discriminated against her based (according to the boxes marked) on "SEX" and "DISABILITY." (<u>Id.</u>) It further identifies the "DATE(S) DISCRIMINATION TOOK PLACE" as April 1, 2008 (under the headings for both "Earliest" and "Latest"). (<u>Id.</u>) The box for "CONTINUING ACTION" bears no mark. (<u>Id.</u>) Under the caption, "THE PARTICULARS ARE," the following description appears:

I. <u>I was forced to resign</u> from my Vice President/ Manager of the Norwood Branch Bank [sic] on April 1, 2008. I was told by Susan Gibson, VP of Human Resources, that if I did not resign I could not get my personal things from my office nor would I get paid. <u>I was forced to resign</u> because my disabled husband hit me in a restaurant in the community which Bill Lawhon, CEO of the Bank felt had tainted the image of the bank and myself in the community.

II. No one in management explained to me why my disabled husband's actions had tainted the bank and myself however other management officials connected with the bank have had children out of wedlock, affairs, and were known alcoholics however their actions did not taint the reputation of the bank nor themselves in the community.

III. I believe that <u>I was forced to resign</u> because of my association with my husband who is disabled in violation of the Americans with Disabilities Act and because of my sex, female, in that I was a victim of domestic violence in violation of Title VII of the 1964 Civil Rights Act, as amended.

(<u>Id.</u> (emphasis added).)

After Defendant attached the foregoing document to its summary judgment brief, Plaintiff submitted (with her response) an unsigned

Charge of Discrimination dated September 19, 2008, lacking a stamp
or other indicia reflecting its receipt by the EEOC. (Docket Entry
26-1 at 17-21.) Under the heading "DISCRIMINATION BASED ON," said
document bears a mark in the box for "RETALIATION," as well as
"SEX" and "DISABILITY." (Id. at 20.) It identifies March 26,
2008, as the "Earliest" of the "DATE(S) DISCRIMINATION TOOK PLACE"
and April 1, 2008, as the "Latest" such date. (Id.) No mark
appears in the box for "CONTINUING ACTION." (Id.)

As to "THE PARTICULARS," said unsigned document lists the
following allegations (with handwritten modifications to the typed
text appearing within brackets):

> I. I was hired around April 2004, as Vice President/
> Manager of the Norwood branch. On <u>March 17,</u>
> <u>[2008,]</u> I informed Bill Lawhon, President and CEO,
> and Susan Gibson, Vice President of Human
> Resources, that I was a victim of domestic violence
> coming from my husband Jerry Smith. [Lawhon told
> me to prosecute my husband and report (illegible).
> During that week, I sought help and counsel from an
> attorney, the police and counselors related to the
> domestic violence.]
>
> On <u>March 20, 2008</u>, Bill Lawhon approved my early
> departure from work, to take immediate care of a
> domestic violence situation and call the
> authorities. On <u>March 21, 2008</u>, my co-workers told
> me that Lawhon had been recently asking them about
> my job performance.
>
> On <u>March 26, 2008</u>, I met [was directed to meet]
> with Susan Gibson, Vice President of Human
> Resources, and Bill Lawhon, President and CEO, who
> told me that the perception of the bank was
> tainted, as well as my own reputation, by the
> domestic violence. I was told not to appear in
> public with my husband, straighten my personal life
> and be in the office all day, every day, even
> though Lawhon had [earlier] told me that I was a
> manager making my own schedule. He told me to
> leave work immediately and not to come back until

tomorrow [the next day.]. Gibson then gave me a pre-typed letter of resignation to sign. When I refused to give my signature, she teared [tore] it and threw it away.

On <u>March 27, 2008</u>, I found that all my files had been removed from my office. I asked Gibson for an explanation and as a response, she called Lawhon. I asked him why I was being fired and he responded that he had assumed that I had quit my job because of what McIntyre had said the day before. I told them that I felt discriminated against and that I was a victim of domestic violence. Gibson responded: "We have checked this with our Attorneys". I also told her that another male company official had been treated better, adding that she knew to whom I was referring too and told that the Bank had paid addiction-rehabilitation for another male company official. She responded that it was none of my business and that it was a personnel issue, while assuring me that they were consistent. Gibson then told me to submit a letter of resignation and threatened me to withhold my personal belongings and my pay if I did not.

II. On <u>April 1, 2008</u>, in order to pick up my personal belongings, after being discharged on March 27, 2008, by Gibson, I signed a paper.

III. I believe that I have been discriminated against <u>by my being discharged and forced to give a letter of resignation</u> because of my sex (female) and retaliated against, in violation of Title VII of the Civil Rights Act of 1964, as amended. I also believe that I have been discriminated against, for being associated with a person with disability and retaliated against for this association, in violation of the Americans with Disabilities Act of 1990. [(My husband suffers from disabilities resulting from injuries incurred at work.)]

(<u>Id.</u> at 20-21 (emphasis added).)

According to Plaintiff:

[The foregoing unsigned document] was completed by the EEOC when I went there to make a complaint on or about September 19, 2008. The form was typed up by the person with whom I talked at the EEOC, and then given to me to look over and make comments. The handwritten comments were added to the form, and I then returned the form to

the EEOC. I understood the EEOC would retype the form to make the handwritten additions and changes. I then signed what I thought was the retyped form. If the document submitted by Defendant is the final version of the form, the EEOC apparently shortened and eliminated some of the statements, and apparently inadvertently left off the X mark beside Retaliation. I simply signed what was given to me that I understood was the retyped version of the form attached hereto. It was clear to me, and from the attached form that was originally prepared by the EEOC person with whom I spoke, that I complained to the EEOC related to discrimination based on sex, retaliation and disability.

(Id. at 17-18.)

## DISCUSSION

Based on the language of the Complaint (quoted in the Procedural Background section, supra, pp. 1-3 & nn. 2-3), it appears Plaintiff has alleged these causes of action:

1) violation of Title VII due to sex discrimination, in that Defendant treated Plaintiff more "harshly and derogatorily" and imposed upon her greater "expectations and demands" than it did similarly-situated male employees from December 2006 to March 26, 2008 (when she contends her employment effectively ended);

2) violation of Title VII due to sex discrimination, as a result of Defendant subjecting Plaintiff to a hostile work environment during the period from December 2006 to March 26, 2008;

3) violation of Title VII due to sex discrimination and due to retaliation for protesting sex discrimination, as well as violation of the ADA due to discrimination based on Plaintiff's association with a disabled person (her husband), all arising from Defendant's decision to transfer Plaintiff from its Norwood office to its main office in January 2008;

-40-

4) violation of Title VII due to sex discrimination and due to retaliation for protesting sex discrimination, as well as violation of the ADA due to discrimination based on Plaintiff's association with a disabled person (her husband), all stemming from Defendant's placement of Plaintiff on probation on March 26, 2008; and

5) violation of Title VII due to sex discrimination and due to retaliation for protesting sex discrimination, as well as violation of the ADA due to discrimination based on Plaintiff's association with a disabled person (her husband), all connected to Defendant's actions and statements on March 26, 2008, March 27, 2008, and April 1, 2008, that forced her to resign.

<u>Summary Judgment Standard</u>

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, the Court "may not make credibility determinations or weigh the evidence." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000). Instead, it "must consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from the facts in the non-movant's favor." <u>Matvia v. Bald Head Island Mgt., Inc.</u>, 259 F.3d 261, 266 (4th Cir. 2001).

"[T]here is no burden upon 'the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact.' Rather, 'the burden on the moving party may be discharged by "showing" – that is, pointing out to the district

court – that there is an absence of evidence to support the nonmoving party's case.'" Carr v. Deeds, 453 F.3d 593, 608 (4th Cir. 2006) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)) (internal emphasis omitted). Conversely, "[t]he party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but 'must come forward with specific facts showing that there is a genuine issue for trial.'" Emmett v. Johnson, 532 F.3d 291, 297 (4th Cir. 2008) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). See also Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 308 (4th Cir. 2006) ("Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law.").

### Plaintiff's Claims for Sex Discrimination, Retaliation, and/or Associational Disability Discrimination prior to March 26, 2008

In moving for summary judgment, Defendant argued that Plaintiff's claims of sex discrimination arising from "disparate treatment predating April 1, 2008 are not properly part of this lawsuit, because 'the EEOC charge defines the scope of the plaintiff's right to institute a civil suit.'" (Docket Entry 23 at 9 (quoting Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 132 (4th Cir. 2002)).) Similarly, Defendant has asserted that any claim by Plaintiff for sex discrimination in the form of a hostile work environment "was not included in [her] EEOC Charge, and is therefore not properly before this Court." (Docket Entry 27 at 5.)

Defendant's contentions in this regard have merit (and have equal application to any retaliation or ADA claim now asserted by Plaintiff regarding events outside the scope of her EEOC Charge); as the United States Court of Appeals for the Fourth Circuit recently reiterated: "'Only those . . . claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit.'" Jones v. Calvert Group, Ltd., 551 F.3d 297, 300 (4th Cir. 2009) (quoting Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 963 (4th Cir. 1996)).[37]

As documented above, supra, pp. 37-40, even if the Court grants effect to Plaintiff's unsigned EEOC Charge dated September 19, 2008 (Docket Entry 26-1 at 20-21)), the record reflects that she complained to the EEOC only about sex discrimination, retaliation, and associational disability discrimination by Defendant from March 26 to April 1, 2008 (more specifically, Defendant's conduct in meetings on March 26, March 27, and April 1, 2008, which forced her to resign). Neither the version of the EEOC Charge Plaintiff actually signed and filed on September 23, 2008 (Docket Entry 23-9 at 2), nor the unsigned form dated four days earlier (Docket Entry 26-1 at 20-21)) reference sex- or disability-based disparate treatment, a hostile work environment, or retaliation before March 26, 2008. Both versions of Plaintiff's

---

[37] The EEOC exhaustion requirement applies to ADA claims as well. See Davis v. Virginia Commonwealth Univ., 180 F.3d 626, 628 n.3 (4th Cir. 1999).

EEOC Charge also fail to allege that her forced resignation represented part of a pattern of discrimination or retaliation.

Under these circumstances, any claims by Plaintiff regarding matters prior to March 26, 2008 (whether for sex discrimination in the form of disparate treatment or hostile work environment, for retaliation, or for associational disability discrimination) may proceed no further, because they: 1) were not "stated in [her] initial charge," Jones, 551 F.3d at 300; 2) are not "reasonably related to the original complaint," id.; and 3) were not "developed by reasonable investigation of the original complaint," id. See, e.g., Chacko v. Patuxent Inst., 429 F.3d 505, 506 (4th Cir. 2005) ("A plaintiff fails to exhaust his administrative remedies where, as here, his administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in his formal suit.").[38] Moreover, in this context, "a failure by the plaintiff to exhaust administrative remedies . . . deprives the federal courts of subject matter jurisdiction over the claim." Jones, 551 F.3d at 300 (emphasis added).

Accordingly, the Court should dismiss for lack of subject matter jurisdiction Plaintiff's claims of sex-based discrimination (in the form of disparate treatment and/or hostile work environment), retaliation, and associational disability discrimination for events preceding March 26, 2008, including her transfer in January 2008. See id. at 301 ("Because [the

---

[38] Plaintiff failed to make any contrary argument in her response brief. (See Docket Entry 26 at 14-20.)

plaintiff's] failure to exhaust administrative remedies deprived the district court of subject matter jurisdiction over the claims, the only function remaining to the court was that of announcing the fact and dismissing the causes." (internal brackets and quotation marks omitted)).  Alternatively, even if the Court had subject matter jurisdiction over any such claims, it should grant summary judgment because they fail as a matter of law (as set out below).

### Sex-Based Disparate Treatment
### (Other than the Transfer to the Main Office)

A plaintiff asserting that an employer subjected her to disparate treatment based on sex may proceed "in one of two ways. First, [s]he may present direct evidence of h[er] superiors' discriminatory intent.  Second, [s]he may attempt to satisfy the test specified in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), which allows h[er] to raise an inference of discriminatory intent by showing that [s]he was treated worse than similarly situated employees of other [genders]."  Sterling v. Tenet, 416 F.3d 338, 345 (2005) (internal parallel citations omitted).  However, "[r]egardless of the route a plaintiff follows . . ., the existence of some adverse employment action is required."  James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004) (internal footnote omitted) (emphasis added).

Plaintiff has failed to provide an evidentiary basis for a reasonable fact-finder to conclude that, during the period prior to March 26, 2008, she suffered an "adverse employment action" with the possible exception of her January 2008 transfer.  As documented

in the Factual Background section (<u>supra</u>, p. 8), Plaintiff has presented evidence of these examples of "disparate treatment":

1) President Lawhon and male Senior Vice Presidents once looked at Plaintiff when the subject of note-taking came up in a meeting (Docket Entry 26-6 at 8);

2) three "male employees were allowed to have outside employment" (changing oil, coaching football, and fixing computers, respectively), but Vice President Gibson told Plaintiff not to work for her husband's "tax" business (Docket Entry 26-7 at 13-14);

3) President Lawhon never came up with any ideas to give Plaintiff "an equivalent" to the expense account male employees used to take clients golfing (Docket Entry 26-9 at 15); and

4) Plaintiff failed to receive an expense card Defendant had promised her (<u>id.</u> at 15-16).

These events do not qualify as "adverse employment actions" for purposes of a Title VII discrimination claim under the standard set by the Fourth Circuit. <u>See</u> <u>James</u>, 368 F.3d at 378-79 ("Congress in Title VII did not want to tolerate invidious discrimination on the part of companies that merely falls short of the ultimate sanction of dismissal. At the same time, the language of the statute requires the existence of some adverse employment action to establish a Title VII violation. The statute's wording makes clear that Congress did not want the specter of liability to hang over every personnel decision."); <u>Boone v. Goldin</u>, 178 F.3d 253, 256 (4th Cir. 1999) ("Congress did not intend Title VII to provide redress for trivial discomforts endemic to employment

. . . ."); <u>Page v. Bolger</u>, 645 F.2d 227, 233 (4th Cir. 1981) (en banc) ("Disparate treatment theory as it has emerged in application of . . . Title VII . . . has consistently focused on the question whether there has been discrimination in what could be characterized as ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating. . . . [T]here are many interlocutory or mediate decisions having no immediate effect upon employment conditions which were not intended to fall within the direct proscriptions of . . . Title VII.").[39]

Thus, to the extent the Court had subject matter jurisdiction over any Title VII claim by Plaintiff of sex-based disparate treatment prior to March 26, 2008 (other than her transfer in January 2008), that claim would fail as a matter of law.

<em>Sex-Based Hostile Work Environment</em>

As detailed in the Procedural Background section (<u>supra</u>, pp. 2-3), Plaintiff's Complaint arguably, cryptically claimed sex

---

[39] Nor could Plaintiff maintain a disparate treatment claim for President Lawhon upbraiding her about her work. "[R]eprimands . . . do not constitute adverse employment actions." <u>Prince-Garrison v. Maryland Dep't of Health and Mental Hygiene</u>, 317 Fed. Appx. 351, 353 (4th Cir. 2009) (citing <u>Thompson v. Potomac Elec. Power Co.</u>, 312 F.3d 645, 651-52 (4th Cir. 2002)). <u>Accord</u> <u>Newby v. Whitman</u>, 340 F. Supp. 2d 637, 664 (M.D.N.C. 2004). Further, in her deposition, Plaintiff conceded that she and Vice President Gibson discussed the fact that President Lawhon "lash[ed] out at people for no reason," not at women <u>because of</u> their gender. (Docket Entry 26-4 at 4.) To the extent she contradicted that testimony with a later affidavit suggesting in conclusory fashion that President Lawhon directed his anger only at women, the Court need not credit that contradiction in resolving Defendant's summary judgment motion. <u>See, e.g.,</u> <u>Erwin v. United States</u>, 591 F.3d 313, 325 n.7 (4th Cir. 2010); <u>Hernandez v. Trawler Miss Vertie Mae, Inc.</u>, 187 F.3d 432, 438 (4th Cir. 1999). Finally, Plaintiff cannot avoid summary judgment by relying on conclusory assertions (even if sworn) that President Lawhon imposed greater demands on her than on men (Docket Entry 26-1 at 4) or that "women could not work for" him (Docket Entry 26-6 at 8). <u>See</u> <u>Evans v. Technologies Applications & Serv. Co.</u>, 80 F.3d 954, 962 (4th Cir. 1996).

discrimination in the form of a hostile work environment, in that it referred to: 1) a meeting in December 2006, when President Lawhon "verbally assaulted" Plaintiff in a manner that male employees did not face (after which she complained about such "harassment," pursuant to Defendant's policy) (Docket Entry 2 at 2); and 2) a "December 10, 2007 meeting," when CEO Dick and President Lawhon "made several inappropriate and wrongful comments to Plaintiff related to other personal matters" (id. at 3).

A claim of this sort requires proof of a "'workplace permeated with discriminatory [e.g., sex-based] <u>intimidation, ridicule, and insult</u> that is sufficiently <u>severe or pervasive</u> to alter the conditions of the victim's employment and create an abusive working environment.'" <u>Jordan v. Alternative Res. Corp.</u>, 458 F.3d 332, 339 (4th Cir. 2006) (quoting <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993) (emphasis added)). "'[I]solated incidents (unless <u>extremely serious</u>) will not amount to discriminatory changes in the terms and conditions of employment.'" <u>Id.</u> (quoting <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998) (emphasis added)). The evidence adduced by Plaintiff (set out in the Factual Background section, <u>supra</u>, pp. 9-10, 19-22) would not permit a reasonable fact-finder to conclude she faced sex-based "intimidation, ridicule, and insult that [wa]s sufficiently severe or pervasive to alter the conditions of [her] employment," <u>Jordan</u>, 458 F.3d at 339 (internal quotation marks omitted).

First, the competent record evidence reflects that the claimed "harassment" in December 2006 had no sex-based component apart from

the fact that Plaintiff is female and President Lawhon is male. As noted in the preceding subsection, supra, p. 47 n.39, Plaintiff's deposition testimony made clear that President Lawhon did not single out employees for abuse because of their gender, but rather that he regularly got angry with people in general for no reason. Although (if true) such conduct would make President Lawhon a less-than-ideal supervisor, the Fourth Circuit has held that complaints of this sort (i.e., objections by an employee from one demographic group to undesirable supervision practices of someone from a different demographic group) fail to support a hostile work environment claim. See, e.g., Hawkins v. Pepsico, Inc., 203 F.3d 274, 281-82 (4th Cir. 2000) (affirming summary judgment for employer on race-based hostile work environment claim, where plaintiff's "complaints about [supervisor's] management style toward her [we]re without a hint of racial significance" and noting that "[l]aw does not blindly ascribe to race all personal conflicts between individuals of different races").

Plaintiff's hostile work environment claim thus turns upon the comments made by President Lawhon and CEO Dick on December 10, 2007. The record evidence related to that meeting (documented in the Factual Background section, supra, p. 19-21) does not, as a matter law, make out a hostile work environment claim. As an initial matter, to the extent Plaintiff complains about the fact that Defendant's officials discussed her personal life, her claim lacks merit because her own testimony confirms that Plaintiff: 1) initially brought up "the fact that [the hospital] had a harlot

-49-

that was sleeping around with [her] husband" to Vice President Gibson; and 2) jointly decided with Vice President Gibson to discuss that issue further with other officials of Defendant. (Docket Entry 26-5 at 7-8.) In addition, the record contains no basis for the Court to adopt Plaintiff's view that CEO Dick's use of a scatological analogy to express a preference that Plaintiff take up her concerns with the hospital in a fashion short of litigation constituted "sexual discrimination" (Docket Entry 26-8 at 13). Simply put, neither CEO Dick's word choice nor his underlying opinion carried sexual or sexist connotations; such matters thus provide no grounds for a sexual harassment claim. See Ziskie v. Mineta, 547 F.3d 220, 228 (4th Cir. 2008) ("Profanity, while regrettable, is something of a fact of daily life. Flatulence, while offensive, is not often actionable, for Title VII is not 'a general civility code.'" (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998))); Bass v. E.I. DuPont de Neumours & Co., 324 F.3d 761, 765 (4th Cir. 2003) (finding hostile work environment claim insufficient where plaintiff's "complaint [wa]s full of problems she experienced with her co-workers and supervisors . . ., [but problems did] not seem to have anything to do with gender, race, or age harassment").

The foregoing analysis leaves only Plaintiff's objection to CEO Dick's and President Lawhon's references to her physical appearance (while discussing her planned weight-loss surgery, see Factual Background section, supra, p. 20-21). For purposes of resolving Defendant's summary judgment motion, the undersigned

Magistrate Judge will assume that these remarks qualify as objectively offensive and sex-based.

No reasonable fact-finder, however, could conclude that said comments satisfy the "severity" element of a hostile work environment claim; in other words, to the extent the references to Plaintiff's "beauty" and possible need for cosmetic surgery constitute sexually-offensive remarks, they fall far short of a level one reasonably could deem "'extremely serious,'" Jordan, 458 F.3d at 339 (quoting Faragher, 524 U.S. at 788). See, e.g., Gupta v. Florida Bd. of Regents, 212 F.3d 571, 584 (11th Cir. 2000) ("A man can compliment a woman's looks . . . on one or several occasions, by telling her that she is looking 'very beautiful,' or words to that effect, without fear of being found guilty of sexual harassment . . . ."), abrogated in part on other grounds, Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006); Pfeil v. Intecom Telecomm., 90 F. Supp. 2d 742, 745, 747-48 (N.D. Tex. 2000) (ruling that supervisor's comments suggesting that plaintiff would look better if she shaved her legs and wore makeup, "as a matter of law, do not constitute sexual harassment," even if they were "offensive"). Moreover, given that this commentary occurred on one occasion, it failed to create a hostile work environment because it was an "isolated incident," not "pervasive" harassment, Jordan, 458 F.3d at 339 (internal quotation marks omitted). See, e.g., Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998) ("Though the two incidents in question - [a supervisor's] comment, apparently regarding [the plaintiff's]

posterior, and his use of papers held in his hand to touch her breasts – are obviously offensive and inappropriate, they are sufficiently isolated and discrete that a trier of fact could not reasonably conclude that they pervaded [the plaintiff's] work environment."), abrogated in part on other grounds, National R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002).

In sum, Plaintiff has not presented sufficient evidence that Defendant subjected her to a hostile work environment before March 26, 2008 (the date she alleges her employment effectively ended) and, as a result, the Court could not allow that claim to proceed even if it had subject matter jurisdiction.

*Sex Discrimination, Retaliation, and Associational Disability Discrimination in Connection with Plaintiff's Transfer*

To establish a claim of discrimination or retaliation related to an employment decision, a plaintiff may proceed "in one of two ways. First, [s]he may present direct evidence of h[er] superiors' discriminatory [or retaliatory] intent. Second, [s]he may attempt to satisfy the test specified in McDonnell Douglas Corp., which allows h[er] to raise an inference of discriminatory intent by showing that [s]he was treated worse than similarly situated employees of other [relevant groups]." Sterling, 416 F.3d at 345 (internal citation omitted).[40] Plaintiff does not argue that the record contains direct evidence her transfer from the Norwood

---

[40] Although courts developed this framework for Title VII discrimination claims, it also has application to Title VII retaliation claims, see Hawkins, 203 F.3d at 281 n.1, and discrimination claims under the ADA, see Ennis v. National Ass'n of Bus. and Educ. Radio, Inc., 53 F.3d 55, 57-59 (4th Cir. 1995).

branch to the main office in January 2008 occurred due to sex or associational disability discrimination or retaliation for opposing sex discrimination (see Docket Entry 26 at 14-20); accordingly, she must satisfy the McDonnell Douglas test, which first requires proof of a prima facie case of discrimination and/or retaliation.  See Coleman v. Maryland Ct. of App., 626 F.3d 187, 190 (4th Cir. 2010).

Sex Discrimination

"[T]he elements of a prima facie case of discrimination under Title VII are:  (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." Id.  In sex discrimination cases, because Title VII makes "sex" a prohibited classification, 42 U.S.C. § 2000e-2(a), "[t]he first element is really a non-issue because everyone is male or female." Steinhauer v. DeGolier, 359 F.3d 481, 484 (7th Cir. 2004).  Plaintiff also has sufficient evidence on the "adverse employment action" element, in light of her testimony that the transfer stripped her of the branch manager title (Docket Entry 26-8 at 16) and President Lawhon's declaration that the transfer took away her authority over office staff (Docket Entry 23-5 at 4). See Boone v. Goldin, 178 F.3d 253, 255-56 (4th Cir. 1999) (noting ruling in Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998), that "reassignment with significantly different responsibilities" can trigger Title VII liability, and indicating that "loss of job title or supervisory responsibility" qualified as "adverse employment action").  Plaintiff's sex discrimination claim

premised on her transfer, however, falls short on the other two prongs of the prima facie case, i.e., "satisfactory job performance" and "different treatment from similarly situated employees outside [her] protected class," <u>Coleman</u>, 626 F.3d at 190.

To meet the latter element, "plaintiffs are required to show that they are <u>similar in all relevant respects</u> to their comparator . . . [, including that they] 'engaged in <u>the same conduct without such differentiating</u> or mitigating <u>circumstances that would distinguish their conduct or the employer's treatment of them</u> for it.'" <u>Haywood v. Locke</u>, 387 Fed. Appx. 355, 359 (4th Cir. 2010) (citing and quoting <u>Mitchell v. Toledo Hosp.</u>, 964 F.2d 577, 583 (6th Cir. 1992)) (emphasis added). <u>Accord</u> <u>Heyward v. Monroe</u>, No. 97-2430, 166 F.3d 332 (decision without opinion), 1998 WL 841494, at *2 (4th Cir. Dec. 7, 1998) (unpublished); <u>Odom v. International Paper Co.</u>, 652 F. Supp. 2d 671, 688 (E.D. Va. 2009), <u>aff'd</u>, 381 Fed. Appx. 246 (4th Cir. 2010); <u>Holtz v. Jefferson Smurfit Corp.</u>, 408 F. Supp. 2d 193, 206 (M.D.N.C. 2006), <u>aff'd</u>, 242 Fed. Appx. 75 (4th Cir. 2007). As part of that showing, a plaintiff generally must present evidence that she and any comparator shared the same supervisor. <u>See</u> <u>Forrest v. Transit Mgmt. of Charlotte, Inc.</u>, 245 Fed. Appx. 255, 257 (4th Cir. 2007); <u>Flateau v. South Carolina Comm'n for the Blind</u>, 50 Fed. Appx. 653, 655 (4th Cir. 2002); <u>Heyward</u>, 1998 WL 841494, at *2; <u>Holtz</u>, 408 F. Supp. 2d at 206.

The record reflects that President Lawhon decided the Norwood branch had not performed well under Plaintiff's management in the fall of 2007 and that, on two occasions in December 2007, Plaintiff

had appeared in public while substantially impaired by alcohol and/or prescription drugs. (Docket Entry 23-5 at 3-4.) Plaintiff has not identified a situation in which President Lawhon failed to transfer a male branch manager whose branch had performed as the Norwood office had in the fall of 2007 and who had two incidents of public impairment. As detailed in the Factual Background section, supra, p. 34 n.34, at most, Plaintiff described two men affiliated in some way with Defendant who had significant alcohol-related issues; however, she offered no evidence about how those men performed their jobs and whether President Lawhon supervised one or refrained from taking action against the other. Under these circumstances, Plaintiff has not met her burden on the "similarly-situated" element of the sex discrimination prima facie case.

Nor has Plaintiff shown that, at the time of her transfer to the main office, she had maintained "satisfactory job performance," Coleman, 626 F.3d at 190. Citing her own sworn statements, Plaintiff contends she performed well and received prior accolades (see Docket Entry 26 at 1); however, Plaintiff's "own testimony, of course, cannot establish a genuine issue as to whether [she] was meeting [her employer's] expectations." King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003). Moreover, the fact that she previously received positive evaluations and pay increases sheds no light on President Lawhon's view of her work at the time of the transfer; if anything, the fact that he recruited Plaintiff to work for Defendant and rewarded her with praise and raises during her tenure (while obviously aware of her gender) undermines any suggestion

-55-

that he transferred her because of her sex, rather than because her performance and public behavior no longer met expectations. See Evans, 80 F.3d at 959 ("[B]ecause Houseman is the same person who hired [the plaintiff], there is a powerful inference that [Houseman's] failure to promote her was not motivated by discriminatory animus." (internal quotation marks omitted)).

Accordingly, Defendant has shown an entitlement to summary judgment on Plaintiff's sex discrimination claim regarding her transfer, if the Court had subject matter jurisdiction over same.

## Retaliation

"To state a prima facie case of retaliation, [a plaintiff] must show (1) that [s]he engaged in a protected activity; (2) [her employer] acted adversely against h[er]; and (3) the protected activity was causally connected to the adverse action." Holland v. Washington Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007). Plaintiff can make out the second of these elements because (as noted above, supra, p. 53) her transfer to the main office qualifies as an "adverse employment action" for purposes of a discrimination claim and thus also meets the lower "materially adverse action" standard applicable to retaliation claims. See Caldwell v. Johnson, 289 Fed. Appx. 579, 588 (4th Cir. 2008) (observing that, in White, 548 U.S. at 67-68, the Supreme Court "noted meaningful differences in the anti-discrimination and anti-retaliation statutes that provided recovery for a far broader range of retaliatory conduct"). Plaintiff's instant claim, however, founders on the other two prongs of her prima facie case.

Title VII makes it "an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). "Under this language, protected activities fall into either the opposition clause or the participation clause." Kubicko v. Ogden Logistics Servs., 181 F.3d 544, 551 (4th Cir. 1999). "'Opposition activity encompasses . . . voicing one's opinions in order to bring attention to an employer's discriminatory activities.'" Id. (quoting Laughlin v. Metropolitan Wash. Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998)). "Participation activity encompasses . . . making a charge, testifying, or participating in any manner in a Title VII investigation, proceeding, or hearing." Id.

The record contains no evidence that Plaintiff engaged in any such "protected activity" prior to her transfer and, therefore, she cannot satisfy the "causal connection" element. See Newby v. Whitman, 340 F. Supp. 2d 637, 660-61 (M.D.N.C. 2004) (holding that retaliation claim cannot proceed where plaintiff fails to present evidence that protected activity occurred prior to adverse action). As documented in the Factual Background section, supra, pp. 37-40, Plaintiff did not go to the EEOC with her own claims of sex discrimination until September 2008. Moreover, she has never asserted that she ever participated in an "investigation,

proceeding, or hearing" regarding sex discrimination allegations of others. (See Docket Entry 2 at 3 (conceding lack of knowledge that other employees "ever formally complained about the harassment of women by Defendant").) Plaintiff thus engaged in no "participation activity" before her transfer. As to possible "opposition activity," the record contains evidence that:

1) in December 2006, she told Vice President Gibson that President Lawhon "verbally assaulted" her (Docket Entry 26-4 at 4);

2) on March 26, 2008, and other unspecified times, Plaintiff objected to President Lawhon (and/or Vice President Gibson) about President Lawhon expressing a view that certain long-term female employees should retire (Docket Entry 26-10 at 2-3); and

3) on March 26, 2008, Plaintiff told President Lawhon and Vice President Gibson that, by placing her on probation as a result of the altercation at Harmanco's, they "were treating [her] unfairly and discriminating against [her]" (Docket Entry 26-6 at 6).

The last of these events clearly occurred after Plaintiff's transfer. Similarly, the only specific date given by Plaintiff as to when she voiced concern over President Lawhon's comments regarding the continued employment of certain long-term female employees also fell after her transfer. Further, to the extent Plaintiff claimed to have made prior objections of that sort, by neglecting to give any time-frame for those complaints, she has failed to provide a basis from which a reasonable fact-finder could conclude that they preceded her transfer. Moreover, Plaintiff has not shown that her complaints to President Lawhon and/or Vice

President Gibson about that subject constituted opposition to sex discrimination; if anything, Plaintiff appeared to object to what she perceived as President Lawhon's age-related, not sex-related, bias. (<u>See</u> Docket Entry 27-7 at 14 (noting that President Lawhon commented on when "these <u>older</u> ladies [in the Norwood office] were going to retire" and how one "made too much money not to be a lending officer, and it was <u>because she had been there so long</u>" (emphasis added)).)[41]  Plaintiff, however, has asserted a Title VII retaliation claim based on opposition to sex discrimination, not a retaliation claim under the Age Discrimination in Employment Act for opposing ageism. (<u>See</u> Docket Entry 2 at 10.)

Finally, although Plaintiff's report to Vice President Gibson about President Lawhon's conduct in December 2006 came before Plaintiff's January 2008 transfer, the competent record evidence does not reflect that said report involved opposition to sex discrimination.  Plaintiff's deposition testimony indicates that she complained about President Lawhon's yelling and cursing; however, it does not reflect that, at the time, she claimed that President Lawhon "verbally assaulted" her <u>because of her sex</u>. (Docket Entry 26-4 at 4.)  Nor has Plaintiff offered a basis for a reasonable fact-finder to conclude that Vice President Gibson subjectively perceived or objectively should have perceived Plaintiff as having claimed sex discrimination.  To the contrary, as previously noted, <u>supra</u>, p. 47 n.39, Plaintiff's deposition

_____

[41] Moreover, Plaintiff admitted President Lawhon also objected to a man staying on the payroll while failing to produce. (<u>See</u> Docket Entry 26-4 at 1.)

testimony reflects that she and Vice President Gibson understood that President Lawhon's intemperate outbursts had a random quality.

Plaintiff's claim for retaliation for challenging sex discrimination thus lacks merit. See, e.g., Sajadian v. American Red Cross, No. 99-1263, 202 F.3d 260 (table decision without opinion), 1999 WL 1111455, at *1 (4th Cir. Dec. 7, 1999) (unpublished) (affirming summary judgment for employer on retaliation claim because, "[a]lthough [plaintiff] raised general concerns about her workload, hours, and denial of leave, there is no evidence that either [her employer or the person to whom she complained] was aware that her complaints were based on an allegation of discrimination"); McNair v. Computer Data Sys., Inc., No. 98-1110, 172 F.3d 863 (table decision without opinion), 1999 WL 30959, at *5 (4th Cir. Jan. 26, 1999) (unpublished) ("[A] general complaint of unfair treatment does not translate into a charge of illegal discrimination." (internal ellipses and quotation marks omitted)); Brown v. Nguyen, Civ. Action No. 7:08-817-HFF-WMC, 2010 WL 836819, at *18 (D.S.C. Mar. 5, 2010) (adopting recommendation that plaintiff's complaint of "rude" conduct by superior failed to qualify as "protected activity").[42]

---

[42] If Plaintiff's report to Vice President Gibson did qualify as "protected activity" opposing sex discrimination, Plaintiff's instant claim still would fail as a matter of law because she has not identified record evidence that Vice President Gibson ever apprised President Lawhon of the complaint. Without proof that President Lawhon knew of Plaintiff's opposition activity, Plaintiff could not show that a retaliatory motive animated his decision to transfer her. See, e.g., Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998) (holding that plaintiff could not make out retaliation claim absent evidence that "relevant decisionmaker" knew of protected activity).
(continued...)

Under these circumstances, if the Court possessed subject matter jurisdiction over Plaintiff's claim that her transfer constituted retaliation for challenging sex discrimination, that claim would fail as a matter of law.

## Associational Disability Discrimination

The ADA prohibits covered employers from "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association[.]" 42 U.S.C. § 12112(b)(4).[43] "Th[is] associational discrimination provision . . . protect[s] qualified individuals from adverse job actions based on unfounded stereotypes and assumptions arising from the employees' relationships with particular disabled persons." Freilich v. Upper Chesapeake Health, Inc., 313 F.3d 205, 215 (4th Cir. 2002) (internal quotation marks omitted). To make out a prima facie case of such discrimination,

---

[42](...continued)
Moreover, the length of time that elapsed between Plaintiff's objection to President Lawhon's conduct in December 2006 and her transfer in January 2008 would undermine any inference that the latter bore a causal connection to the former. See, e.g., Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998) ("A thirteen month interval between the [protected activity] and [the adverse action] is too long to establish causation absent other evidence of retaliation.").

[43] Congress amended the ADA effective January 1, 2009, but that amendment did not alter this provision. See ADA Amendments Act of 2008, Pub. L. 110-325 (Sept. 25, 2008). To the extent said amendment modified other parts of the ADA that affect Plaintiff's instant claim (such as the definition of "disability," 42 U.S.C. § 12102(2)), those modifications do not apply retroactively. See Schneider v. Giant of Md., LLC, 389 Fed. Appx. 263, 267 n.3 (4th Cir. 2010); Shin v. University of Md. Med. Sys. Corp., 369 Fed. Appx. 472, 478 n.14 (4th Cir. 2010); Blackburn v. Trustees of Guilford Technical Cmty. Col., ___ F. Supp. 2d ___, ___ n.2, 2010 WL 3310247, at *5 n.2 (M.D.N.C. 2010). Accordingly, this Memorandum Opinion cites to the provisions of the ADA in effect prior to January 1, 2009, and judicial decisions construing those provisions.

"a plaintiff must prove by a preponderance of the evidence that (1) she was in the protected class; (2) she [suffered an adverse employment action]; (3) at the time of [such action], she was performing her job at a level that met her employer's legitimate expectations; and (4) [the adverse employment action] occurred under circumstances that raise a reasonable inference of unlawful discrimination[.]"  Ennis v. National Ass'n of  Bus. and Educ. Radio, Inc., 53 F.3d 55, 58 (4th Cir. 1995).  For reasons discussed above, supra, p. 53, Plaintiff's transfer qualifies as an adverse employment action; however, Plaintiff cannot satisfy any of the other three elements of her prima facie case.

To meet her burden on the first element, Plaintiff must present sufficient evidence that her husband had a disability within the meaning of the ADA of which her employer had knowledge. See Ennis, 53 F.3d at 59-60.  Under the ADA, "[t]he term 'disability' means, with respect to an individual – (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2) (2008).[44]  "It is insufficient for individuals attempting to prove disability status under this test to merely

----

[44] Notably, "the term 'disability' does not include temporary medical conditions, even if those conditions require extended leaves of absence from work[.]"  Halperin v. Abacus Tech. Corp., 128 F.3d 191, 199 (4th Cir. 1997) (internal citations omitted), abrogated in part on other grounds, Baird ex rel. Baird v. Rose, 192 F.3d 462, 469 n.8 (4th Cir. 1999).

submit evidence of a medical diagnosis of an impairment." <u>Toyota Motor Mfg., Ky., Inc. v. Williams</u>, 534 U.S. 184, 198 (2002).

In this case (as detailed in the Factual Background section, <u>supra</u>, pp. 11-13), Plaintiff has submitted no evidence that, at the time of her transfer, her husband <u>even</u> had "a medical diagnosis of an impairment" (or that he had a "record" of such a diagnosis or that Defendant "regarded" him as having such a diagnosis), much less proof of a disability <u>in addition to</u> such a medical diagnosis. In her response brief, Plaintiff cites her own affidavit and affidavits from her sister and father for the proposition that, "[f]rom September 6, 2006, until well after [March 26, 2008], her husband was disabled and unable to return to his work, and he received full Worker's Compensation benefits." (Docket Entry 26 at 3.) Plaintiff has identified no authority that would permit her to maintain her instant claim by simply offering her (and her relatives') conclusory lay opinion that, as of January 2008, her husband had an unspecified disability due to his accident in September 2006. (<u>See</u> Docket Entry 26 at 17-19.)[45] Moreover, courts have rejected the view that a "finding of 'disability' for purposes of [a] worker's compensation program was the equivalent of a 'disability' finding for purposes of the [parallel provisions of the] Rehabilitation Act." <u>Rolland v. Potter</u>, 492 F.3d 45, 49 (1st

---

[45] Plaintiff's failure of proof becomes even clearer given the uncontested record evidence that her husband: 1) denied knowledge that he ever received a diagnosis of any mental illness (Docket Entry 26-11 at 13); 2) reported that he discontinued physical therapy in December 2007 (<u>id.</u> at 18); and 3) resumed sign repair work in late 2007 (Docket Entry 26-4 at 13; Docket Entry 26-11 at 11, 16).

Cir. 2007). Accord Schapiro v. New York City Dep't of Health, 25 Fed. Appx. 57, 61 n.2 (2d Cir. 2001); Marinelli v. City of Erie, Pa., 216 F.3d 354, 366 n.8 (3d Cir. 2000).

In addition, for reasons previously discussed, supra, pp. 55-56, Plaintiff has not produced competent evidence that, at the time of her transfer, she "was performing her job at a level that met her employer's legitimate expectations," Ennis, 53 F.3d at 58. Finally, Plaintiff has failed to identify any basis in the record for a reasonable fact-finder to conclude her transfer "occurred under circumstances that raise a reasonable inference of unlawful discrimination," id. In this regard, Plaintiff has offered no plausible rationale for why – if her association with her husband inspired discriminatory animus in President Lawhon – he waited 16 months after he learned of her husband's injury to transfer her.[46]

In light of these shortcomings in Plaintiff's evidence, if the Court had subject matter jurisdiction over her claim that Defendant transferred her because of her association with a disabled person, it nonetheless should enter summary judgment in Defendant's favor.

<u>Plaintiff's Claims for Sex Discrimination, Retaliation, and Associational Disability Discrimination Related to Her Placement on Probation on March 26, 2008, and Her Resignation/Constructive Discharge on April 1, 2008</u>

The parties agree that: 1) on March 26, 2008, President Lawhon placed Plaintiff on probation; 2) on March 26 and 27, 2008, Plaintiff, President Lawhon, and Vice President Gibson discussed

_____

[46] To the extent (as set out in the Factual Background section, supra, p. 14 n.12, 22 n.21) Plaintiff seeks to connect her husband's injury, his affair, and her transfer, she relies on unreasonably attenuated inferences.

-64-

the issue of resignation; and 3) on April 1, 2008, Plaintiff signed a resignation letter. (Docket Entry 23 at 5-6; Docket Entry 26 at 10-12.) Plaintiff appears to contend that both the probation and what she characterizes as her forced resignation (or constructive discharge)constituted sex discrimination, retaliation for objecting to sex discrimination, and associational disability discrimination. (See Docket Entry 26 at 14-20.) In pursuing such claims, a plaintiff may proceed "in one of two ways. First, [s]he may present direct evidence of h[er] superiors' discriminatory [or retaliatory] intent. Second, [s]he may attempt to satisfy the test specified in McDonnell Douglas Corp., which allows h[er] to raise an inference of discriminatory intent by showing that [s]he was treated worse than similarly situated employees of other [relevant groups]." Sterling, 416 F.3d at 345 (internal citation omitted).[47] Plaintiff does not argue that the record contains direct evidence that Defendant placed her on probation or constructively discharged her because of her sex or her association with a disabled person or in retaliation for opposing sex discrimination (see Docket Entry 26 at 14-20); accordingly, she must satisfy the McDonnell Douglas test, which first requires proof of a prima facie case of discrimination and/or retaliation. See Coleman, 626 F.3d at 190.

*Sex Discrimination*

"[T]he elements of a prima facie case of discrimination under Title VII are: (1) membership in a protected class; (2)

---

[47] As discussed above, supra, p. 52 n.40, this framework applies equally to Title VII discrimination and retaliation claims and ADA discrimination claims.

satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." Id.[48] In sex discrimination cases, because Title VII makes "sex" a prohibited classification, 42 U.S.C. § 2000e-2(a), "[t]he first element is really a non-issue because everyone is male or female." Steinhauer, 359 F.3d at 484. Plaintiff, however, has not produced sufficient evidence on any of the three remaining prongs of the prima facie test.

First, Plaintiff's evidentiary forecast does not show that the probation imposed by President Lawhon altered the terms and conditions of her employment such that it rose to the level of an "adverse employment action," Coleman, 626 F.3d at 190. "[I]n some circumstances at least, probation may be an adverse employment action." Guarin v. Our Lady of Lourdes Reg'l Med. Ctr. Inc., No. 98-30148, 170 F.3d 184 (table decision without opinion), 1999 WL 47035, at *3 n.2 (5th Cir. Jan. 28, 1999) (citing Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996)). Accord Russell v. BSN Med., Inc., 721 F. Supp. 2d 465, 477 (W.D.N.C. 2010) ("[W]here an employee's probation has a tangible effect on the terms or conditions of employment, it may be considered an adverse

---

[48]   Additionally, "as a general rule, . . . plaintiffs [who allege discriminatory firing] must show that they were replaced by someone outside their protected class in order to make out a prima facie case." Miles v. Dell, Inc., 429 F.3d 480, 486 (4th Cir. 2005). Plaintiff has not presented any argument on this point (see Docket Entry 26 at 14-20) and, as Defendant notes, Plaintiff's own evidence indicates that a female replaced her (see Docket Entry 27 at 1-2).

employment action.").[49]   However, as the United States Court of Appeals for the Fifth Circuit observed in affirming entry of summary judgment for an employer, a reasonable fact-finder could not conclude that probation constituted an adverse employment action where, as here, the record reflects that:

> [The plaintiff's] probation did nothing to alter [her] employment status.  On probation, [she would have] received the same pay and held the same job responsibilities.  The only impact the probation had was that if [she] violated company policies during [the period] of probation, [she] would [have] face[d] [termination of her employment, a] stiffer discipline for the violation than [she] would have if [she] were not on probation.

Stewart v. Missouri Pac. R. Co., 121 Fed. Appx. 558, 562-63 (5th Cir. 2005) (discussing definition of "adverse employment action" dictated by Ellerth, 524 U.S. at 761).[50]

---

[49] For example, one court affirmed – on plain error review – a jury's finding of an adverse employment action where the plaintiff's job duties changed markedly as a result of the probation imposed by the defendant-employer.  See Thompson v. Memorial Hosp. of Carbondale, 625 F.3d 394, 406-08 (7th Cir. 2010).

[50] Other courts have adopted the same view.  See, e.g., Cornelius v. City of Columbia, 663 F. Supp. 2d 471, 476-77 (D.S.C. 2009) (finding no "adverse employment action" because plaintiff failed to show that "probation he received affected the terms, benefits or conditions of his employment"); Robinson-Reeder v. American Council on Educ., 532 F. Supp. 2d 6, 16-17 (D.D.C. 2008) ("[The] plaintiff has not alleged that the probation notice changed the terms, conditions, or privileges of her employment – nor could she make such an allegation.  The probation notice did nothing more than warn plaintiff about potential consequences for future inappropriate behavior.  Though the notice contained a warning about the possibility of future termination, . . . [such a warning] does not constitute an independent adverse employment action." (internal quotation marks omitted)); Mathis v. Wachovia, 509 F. Supp. 2d 1125, 1147 (N.D. Fla. 2007) ("[W]hile [the plaintiff] was temporarily placed on probation . . ., she did not lose any job benefits and as a result, this would not qualify as an adverse employment action.").  But see Rachel-Smith v. FTData, Inc., 247 F. Supp. 2d 734, 746 (D. Md. 2003) ("To the extent that Plaintiff's performance was to be reviewed on a weekly basis while she was placed on probation and lack of performance or meeting objectives during this period would be considered grounds
(continued...)

Nor has Plaintiff produced evidence sufficient to prove that
Defendant constructively discharged her. "Because the claim of
constructive discharge is so open to abuse by those who leave
employment of their own accord, [the Fourth] Circuit has insisted
that it be carefully cabined." <u>Honor v. Booz-Allen & Hamilton,
Inc.</u>, 383 F.3d 180, 187 (4th Cir. 2004) (internal quotation marks
omitted). Accordingly, "a plaintiff must at the outset show that
h[er] employer 'deliberately made [her] working conditions
intolerable in an effort to induce [her] to quit.'" <u>Heiko v.
Colombo Sav. Bank, F.S.B.</u>, 434 F.3d 249, 262 (4th Cir. 2006)
(quoting <u>Matvia v. Bald Head Island Mgmt., Inc.</u>, 259 F.3d 261, 272
(4th Cir. 2001)). "Plaintiff must therefore demonstrate: (1) that
[her] employer's actions were deliberate, and (2) that working
conditions were intolerable." <u>Id.</u>[51] She has done neither.

As an initial matter, in the words of the Fourth Circuit,
"[o]n the record before [the Court], [Plaintiff] has not shown a
deliberate intent on the part of [Defendant] to force h[er] to
leave. In fact, it was [Plaintiff] h[er]self who initiated the

_____

[50](...continued)
for dismissal, Plaintiff's placement on probation may be considered an employment
action that adversely affected the conditions of [her] employment." (internal
brackets, citations, and quotation marks omitted)). It does not appear that the
Fourth Circuit has decided whether or when probation would constitute an "adverse
employment action." <u>See</u> <u>Johnson v. Mechanics & Farmers Bank</u>, 309 Fed. Appx. 675,
680, 682 (4th Cir. 2009) (noting, but not addressing, argument that plaintiff's
placement on probation failed to qualify as "adverse employment action").

[51] "An employer's actions are deliberate only if they were intended by the
employer as an effort to force the plaintiff to quit." <u>Heiko</u>, 434 F.3d at 262
(quoting <u>Matvia</u>, 259 F.3d at 272). "Whether an employment environment is
intolerable is determined from the objective perspective of a reasonable person."
<u>Id.</u>

events that ultimately led to h[er] departure." Id. More specifically, as detailed in the Factual Background section, supra, pp. 31-33, Plaintiff's deposition testimony regarding the events of March 26, 2008, confirms that: 1) she raised the issue of resignation; and 2) President Lawhon and Vice President Gibson clearly stated that they did not seek her resignation.

In an effort to bolster her claim of constructive discharge, Plaintiff asserts that, during the meeting on March 26, 2008, she determined that Defendant "planned to continue to progressively punish her, harass her and make her life miserable to try to make her resign, and that [Defendant] would ultimately fire her if she did not resign in response to the actions and threats that were made against her on that day." (Docket Entry 26 at 11.) This assertion falls short as a matter of law: "[A]pprehension of future termination is insufficient to establish constructive discharge - instead, an employee is obliged not to assume the worst, and not to jump to conclusions too fast." Torrech-Hernandez v. General Elec. Co., 519 F.3d 41, 52 (1st Cir. 2008) (internal quotation marks omitted). Accord Aryain v. Wal-Mart Stores Tex. LP, 534 F.3d 473, 481-82 (5th Cir. 2008); Agnew v. BASF Corp., 286 F.3d 307, 310 (6th Cir. 2002); West v. Marion Merrill Dow, Inc., 54 F.3d 493, 497-98 (8th Cir. 1995); Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir. 1987).[52]

---

[52] President Lawhon's action in ordering the removal from Plaintiff's office of confidential information that belonged to Defendant and its clients does not support an inference that he had an intent to force her to resign. The
(continued...)

"Even if [Plaintiff] could prove that [Defendant] deliberately intended to force h[er] out, [s]he still cannot show that the work environment at [her office] was objectively intolerable." Heiko, 434 F.3d at 263. On both days of her deposition, Plaintiff had a chance to describe all of her interactions with President Lawhon and Vice President Gibson on March 26 and 27 and April 1, 2008, but she provided no testimony that would allow a reasonable fact-finder to conclude that she faced onerous job changes or an unbearable employment environment. (See Docket Entry 26-6 at 4-18; Docket Entry 26-9 at 6-7, 13.) Neither placement on "probation" nor issuance of an ultimatum that a "fail[ure] to improve" will result in discharge "constitute the intolerable working conditions required to prove constructive discharge." Boze v. Branstetter, 912 F.2d 801, 803, 805 (5th Cir. 1990). See also Fischer v. Andersen Corp., 483 F.3d 553, 557 (8th Cir. 2007) ("Nor does a threat of discharge, in and of itself, create conditions so intolerable that a reasonable person would resign.").

The prospect of probation may have caused Plaintiff distress, particularly given her view of such sanction as unjustified; however, "'a feeling of being unfairly criticized [and] difficult

---

[52](...continued)
uncontested record evidence reflects that President Lawhon only took that action after he received word from Senior Vice President McIntyre that, following her departure from the office on March 26, 2008, Plaintiff expressed an intention to resign the following day. (Docket Entry 23-6 at 3.) Finally, Plaintiff has cited no authority that, once an employee has raised the issue of resignation, an employer evidences an intent to constructively discharge the employee by insisting on written documentation of any such resignation as a condition of paying out any accrued vacation time or before allowing the employee to remove items from the office. (See Docket Entry 26 at 14-20.)

or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.'" Heiko, 434 F.3d at 262 (quoting James, 368 F.3d at 378). See also West v. Marion Merrell Dow, Inc., 54 F.3d 493, 498 (8th Cir. 1995) ("[F]rustration and embarrassment . . . do not make work conditions sufficiently intolerable to constitute constructive discharge."). "[N]or are employees guaranteed a working environment free of stress." Heiko, 434 F.3d at 263 (internal quotation marks omitted).

In addition to falling short on the "adverse employment action" element, Plaintiff also has failed to carry her burden on the "satisfactory job performance" prong of the prima facie test, Coleman, 626 F.3d at 190. As previously noted, supra, pp. 21-22, 54-56, in December 2007, President Lawhon concluded that Plaintiff's work performance had slipped and that she twice had appeared publicly impaired by alcohol and/or prescription drugs (once resulting in her being carried out of a bar and the other ending in her hospitalization); as a result, he transferred her to the main office, relieved her of some duties, and offered her additional training. The record (detailed in the Factual Background section, supra, pp. 28-31) reflects that, during the week of March 17, 2008 (within approximately six weeks of Plaintiff's return to work, after spending the month of January 2008 undergoing intensive therapy in the wake of a second hospitalization that ensued when she learned of her transfer, see supra, p. 23), President Lawhon received what he subjectively (and reasonably) considered reliable reports that:

1) while out for the evening with her husband and a friend, Plaintiff performed a sex act on the friend in the bathroom of a local restaurant (that banked with Defendant);

2) Plaintiff's husband confronted the pair in flagrante delicto and, in his words, "commenced to beating on them";

3) the restaurant manager threw all three of them out; and

4) people in the community, including an employee of one of Defendant's competitors, had begun openly discussing the incident.

Plaintiff denies that any such sex act occurred. (Docket Entry 26 at 12-13.)[53] However, Plaintiff has not raised a genuine

---

[53] In making this denial, the "Factual Background" section of Plaintiff's response brief goes too far; specifically, it asserts that Defendant's "story of adulterous bathroom sex <u>has been fabricated</u> to try to justify further punishment calculated to eliminate its sole female Branch Manager/Vice President . . . ." (Docket Entry 26 at 13 (emphasis added).) Notwithstanding this Court's Local Rule declaring that "[e]ach statement of fact should be supported by reference to a part of the official record in the case," M.D.N.C. R. 7.2(a)(2), Plaintiff's counsel, Bruce M. Simpson of James, McElroy & Diehl, P.A., offers no citation of any sort after the foregoing statement (which effectively asserts that Manager Hinson, Senior Vice President McIntyre, and President Lawhon committed perjury when – in affidavits submitted to this Court – they described events inconsistent with Defendant having "fabricated" a "story of adulterous bathroom sex"). (<u>See</u> Docket Entry 26 at 13.) Moreover, the undersigned Magistrate Judge's thorough review of the record revealed no evidence to support an assertion that Defendant engaged in any such fabrication. Mr. Simpson's action in making an unsupported (and, given the state of the record, unsupportable) declaration that Defendant "fabricated" sworn accounts tendered to the Court constitutes, at a minimum, a serious lapse in professional judgment. Unfortunately, the transcript of Plaintiff's deposition also documents other unacceptable conduct by Mr. Simpson; for example, early on the first day of the deposition, Mr. Simpson made a series of improperly argumentative objections culminating with this statement: "I'm not even making an objection now. <u>I'm making a speech</u>. I'm suggesting to you that possibly you're wasting our time by asking the same questions over and over again." (Docket Entry 26-4 at 10 (emphasis added).) When Defendant's counsel wisely responded that she "[was] not going to engage in any more colloquy with [Mr. Simpson] about that . . .[, but instead was] going to continue [her] examination," Mr. Simpson sarcastically replied: "I know. You're probably going to keep asking the same question over and over 16 different ways, and I'm probably going to complain about it maybe again in 15 or 20 minutes." (<u>Id.</u>) Mr.
(continued...)

-72-

dispute as to whether President Lawhon actually believed the contrary reports he had received prior to placing her on probation (and, in her view, constructively discharging her); indeed, in her deposition, Plaintiff expressly acknowledged that, despite her protestations of innocence during their meeting on March 26, 2008, President Lawhon "tended to believe the rumors he had heard." (Docket Entry 26-9 at 7; see also id. at 16 ("The Harmanco's incident happened where, basically, they didn't believe me. They believed what people in the community were saying . . . .").) Under these circumstances, Plaintiff cannot show that, at the time of her placement on probation and/or any constructive discharge, she was meeting Defendant's legitimate expectations of its employees. See King, 328 F.3d at 149 (quoting Evans, 80 F.3d at 960-61, for proposition that "[i]t is the perception of the decision-maker which is relevant, not the self-assessment of the

---

[53](...continued)
Simpson's unprofessional demeanor carried over to the second day of Plaintiff's deposition; for example, in the course of an exchange with Defendant's counsel about the permissible scope of questioning, Mr. Simpson stated: "I don't know that you are entitled today to do that. . . . But, you know, again, you and I disagree about lots of things about how you reign and rule over depositions. So I guess we'll just have to continue to be your subjects, and you do and say, declare whatever you say." (Docket Entry 26-8 at 7.) In its Local Rules, this Court has expressed an expectation that counsel will "cooperate and be courteous with each other in all phases of the discovery process." M.D.N.C. R. 26.1(b)(1). See also M.D.N.C. R. 1.1 (noting that Local Rules "shall be interpreted and applied to foster civility in the practice of law before this Court"). In light of Mr. Simpson's foregoing apparent material breaches of Local Rules 7.2(a)(2) and 26.1(b)(1), the undersigned Magistrate Judge will recommend that the United States District Judge assigned to review this Recommendation order Mr. Simpson to show cause why he and/or Plaintiff should not be sanctioned. See M.D.N.C. R. 83.4(a) ("If an attorney or a party fails to comply with a local rule of this court, the court may impose sanctions against the attorney or party, or both.").

plaintiff," in ruling that plaintiff failed to carry burden as to
"satisfactory performance" element of prima facie case).[54]

Finally, Plaintiff has not come forward with sufficient
evidence that she received "different treatment from similarly
situated employees outside [her] protected class," Coleman, 626
F.3d at 190. On this element of the prima facie test, "plaintiffs
are required to show that they are <u>similar in all relevant respects</u>
to their comparator . . . [, including that they] 'engaged in <u>the</u>
<u>same conduct without such differentiating</u> or mitigating
<u>circumstances that would distinguish their conduct or the</u>
<u>employer's treatment of them</u> for it.'" Haywood, 387 Fed. Appx. at
359 (citing and quoting Mitchell, 964 F.2d at 583) (emphasis
added). Accord Heyward, 1998 WL 841494, at *2; Odom, 652 F. Supp.
2d at 688; Holtz, 408 F. Supp. 2d at 206. In general, a plaintiff
also must prove that she and any comparator shared supervisors.
See Forrest, 245 Fed. Appx. at 257; Flateau, 50 Fed. Appx. at 655;
Heyward, 1998 WL 841494, at *2; Holtz, 408 F. Supp. 2d at 206.

Plaintiff has failed to identify any incident in which
President Lawhon received reports he credited of an employee he
supervised (and recently had transferred due to perceived poor job
performance and two incidents of public impairment) having engaged

<hr/>

[54] Although Plaintiff apparently contends that "any alleged wrongdoing by
[her] . . . in her personal life . . . should be immaterial" (Docket Entry 26 at
12-13), she has cited no authority for the proposition that an employer must
refrain from taking any action when it concludes that an employee engaged in a
sex act with a person other than his or her spouse in the bathroom of a
restaurant (that does business with the employer) and that a fight requiring the
intervention of the restaurant manager broke out as a result. (See id.)

in a sex act with a person other than the employee's spouse in the restroom of a restaurant (that did business with Defendant), while the employee's spouse was on the premises, resulting in a fight. Instead, Plaintiff characterizes the incident at Harmanco's as a "false rumor[] of [an] affair[]" and asserts that "[m]ales were not treated adversely even where there were actual known affairs." (Docket Entry 26 at 16.) Based on the record in this case, the undersigned Magistrate Judge finds neither Plaintiff's characterization of the basis on which President Lawhon acted against her, nor her definition of the applicable class of "similarly-situated" comparators defensible as a matter of law.[55] As a result, Plaintiff has not satisfied the "similarly-situated" element of her instant prima facie case.

Given these conclusions, the Court should enter summary judgment against Plaintiff on her sex discrimination claim as to her placement on probation and/or alleged constructive discharge.[56]

_____

[55] In other words, an employer reasonably might choose to treat an employee whom it perceives as having had an extra-marital affair differently than an employee it perceives as having precipitated a brawl in a customer's place of business by engaging in a sex act with a friend while her spouse waited nearby.

[56] In her response brief, Plaintiff also correctly observed that, in addition to "disparate treatment" claims, Title VII also permits "disparate impact" claims. (Docket Entry 26 at 15.) "To establish a prima facie case of disparate impact discrimination under Title VII, a plaintiff must show that [an employer's] facially neutral employment practice had a significantly discriminatory impact." Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 265 (4th Cir. 2005). Plaintiff has argued that Defendant "declared that [she] had violated [its] ethics policy in being the victim of domestic violence and . . . [, since] [f]emales were clearly more likely to be victims of domestic violence than males . . . [, t]hese policies were clearly unfair to females." (Docket Entry 26 at 16.) The record does not support this characterization of Defendant's action; instead, in her deposition, Plaintiff conceded that President
(continued...)

*Retaliation*

"To state a prima facie case of retaliation, [a plaintiff] must show (1) that [s]he engaged in a protected activity; (2) [her employer] acted adversely against h[er]; and (3) the protected activity was causally connected to the adverse action." <u>Holland</u>, 487 F.3d at 218. Plaintiff appears to contend that Defendant retaliated against her for contesting sex discrimination both by placing her on probation on March 26, 2008, and by constructively discharging her through its actions on March 26 and 27 and April 1, 2008. (<u>See</u> Docket Entry 26 at 11-12, 19.) For reasons discussed previously, <u>supra</u>, pp. 68-71, Plaintiff cannot proceed with a claim for constructive discharge. However, because the standard for showing a "materially adverse action" for a retaliation claim falls below the level required to establish an "adverse employment action" for a discrimination claim, <u>see</u> <u>Caldwell</u>, 289 Fed. Appx. at 588, the undersigned Magistrate Judge will assume for purposes of Defendant's summary judgment motion that Plaintiff's placement on probation meets the second prong of a retaliation prima facie case. Plaintiff's instant claim nonetheless fails as a matter of law because she has produced insufficient evidence on the other elements of the prima facie test. More specifically, as set forth

---

[56](...continued)
Lawhon perceived her as having precipitated an altercation by engaging in a sex act with a friend in the bathroom of a restaurant (that banked with Defendant) notwithstanding her husband's presence at the restaurant. (<u>See</u> Docket Entry 26-9 at 7, 16.) Plaintiff has not presented statistical or other competent evidence that women face disproportionate impact from an interpretation of an employee code of conduct that construes such behavior as unacceptable. Accordingly, she cannot maintain a disparate impact sex discrimination claim.

above, _supra_, pp. 57-60, Plaintiff has not shown that she engaged in "protected activity" pertaining to sex discrimination prior to Defendant's imposition of probation.[57]

*Associational Disability Discrimination*

The prima facie case for a claim of associational disability discrimination requires proof by a plaintiff "that (1) she was in the protected class; (2) she [suffered an adverse employment action]; (3) at the time of [such action], she was performing her job at a level that met her employer's legitimate expectations; and (4) [the adverse employment action] occurred under circumstances that raise a reasonable inference of unlawful discrimination[.]" _Ennis_, 53 F.3d at 58. Plaintiff has fallen short on each prong.

First – as the discussion of Plaintiff's other associational disability claim, _supra_, pp. 62-64, makes clear – Plaintiff failed to offer sufficient evidence that, from March 26 to April 1, 2008, her husband had a disability as defined by the ADA of which Defendant had knowledge. Second, as previously discussed, _supra_, pp. 66-71, Plaintiff's placement on probation does not constitute an "adverse employment action" under the standard applicable to discrimination claims and she has produced insufficient evidence of constructive discharge. Third, for reasons set forth above, _supra_,

---

[57] To the extent Plaintiff's complaint to Vice President Gibson in December 2006 about President Lawhon's temper qualified as "protected activity" opposing sex discrimination, Plaintiff's instant retaliation claim still would fall short because she has cited no evidence that Vice President Gibson told President Lawhon of Plaintiff's earlier report about him. _See, e.g._, _Dowe_, 145 F.3d at 657. Further, the passage of time from December 2006 to Plaintiff's placement on probation on March 26, 2008, precludes an inference of a causal connection between those two events. _See, e.g._, _Causey_, 162 F.3d at 803.

pp. 71-74, Plaintiff has not identified adequate record support to show that, as of March 26 to April 1, 2008, she "was performing her job at a level that met her employer's legitimate expectations," Ennis, 53 F.3d at 58. Finally, Plaintiff has provided no basis for a reasonable fact-finder to conclude that Defendant placed her on probation and/or constructively discharged her "under circumstances that raise a reasonable inference of unlawful discrimination," id. More specifically, Plaintiff's theory of causation: 1) relies on an untenable inference that Defendant "should have known" that an undiagnosed mental disability stemming from her husband's work-place injury in September 2006 caused him to respond as he did to whatever interaction she had with Burris in March 2008 (Docket Entry 26-7 at 3); and 2) ignores the undisputed fact that, when President Lawhon placed Plaintiff on probation (and, from her perspective, constructively discharged her), he acted on a belief that Plaintiff had unreasonably instigated the altercation by engaging in a sex act with Burris in the restaurant bathroom while her husband waited nearby (Docket Entry 26-9 at 7, 16).

CONCLUSION

For the foregoing reasons: 1) the Court lacks subject matter jurisdiction over Plaintiff's Title VII and ADA claims as to events before March 26, 2008, because Plaintiff failed to exhaust applicable remedies; and 2) Defendant has shown "'that there is an absence of evidence to support [Plaintiff's] case,'" Carr, 453 F.3d at 608 (quoting Celotex Corp., 477 U.S. at 325), as to

Plaintiff's remaining claims (and, alternatively, to the claims for which she failed to exhaust her administrative remedies).[58]

**IT IS THEREFORE RECOMMENDED** that Defendant's Motion for Summary Judgment (Docket Entry 22) be **GRANTED**, but that, in disposing of Plaintiff's claims, the judgment reflect that Plaintiff's Title VII and ADA claims for events prior to March 26, 2008, are dismissed for lack of subject matter jurisdiction, rather than on the merits.

**IT IS FURTHER RECOMMENDED** that Defendant's Motion for Judgment on the Pleadings (Docket Entry 12) be **DENIED AS MOOT.**

**IT IS FURTHER RECOMMENDED** that, for reasons set forth above, supra, pp. 72-73 n.53, Plaintiff and Plaintiff's counsel, Bruce M. Simpson of James, McElroy & Diehl, P.A., be ordered to show cause why the Court should not sanction one or both of them pursuant to this Court's Local Rule 83.4(a) for violating:  1) Local Rule 7.2(a)(2) by including in Plaintiff's summary judgment response brief a statement of fact asserting that Defendant's "story of adulterous bathroom sex has been fabricated to try to justify further punishment calculated to eliminate its sole female Branch Manager/Vice President" (Docket Entry 26 at 13), without any citation to the record and in the absence of any apparent evidentiary basis; and 2) Local Rule 26.1(b)(1) by behaving in an

---

[58] Because Plaintiff has tendered insufficient evidence to sustain her claims, the Court need not address Defendant's alternative argument that North Carolina's Worker's Compensation Act precludes recovery in this forum for certain damages she seeks (see Docket Entry 23 at 19-20).

unduly argumentative and sarcastic manner during Plaintiff's deposition (Docket Entry 26-4 at 10; Docket Entry 26-8 at 7).

   /s/ L. Patrick Auld        
**L. Patrick Auld**
**United States Magistrate Judge**

February 11, 2011